## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-KA-00521-SCT

*GLEN L. CONLEY, JR. a/k/a GLEN CONLEY, II*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/03/1998 |
| TRIAL JUDGE: | HON. KEITH STARRETT |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GARY L. HONEA |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | DUNN O. LAMPTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/19/2001 |
| MOTION FOR REHEARING FILED: | 05/08/2001; denied and opinion modified at paragraph 65 - 07/19/2001 |
| MANDATE ISSUED: | 7/26/2001 |

### BEFORE PITTMAN, C.J., MILLS AND WALLER, JJ.

### MILLS, JUSTICE, FOR THE COURT:

¶1. Glen L. Conley, Jr., was convicted of capital murder in the Circuit Court of Pike County in May of 1994. He was sentenced to life imprisonment without the possibility of parole. Aggrieved, Conley appeals to this Court.

### FACTS

¶2. Whitney Berry was born out of wedlock to Teronda Berry[1] on October 28, 1990. Glen Conley maintains that he is Whitney's father though he has denied paternity in the past. From 1990 to 1994, the relationship between Conley and Teronda and Whitney was intermittent at best. During this time Conley did not purchase diapers, milk, or clothing for Whitney, nor did he pay child support.

¶3. In early April, 1994, Conley was fired from his job with Baton Rouge Home Health. Shortly thereafter, he inquired with the State Farm Insurance office in Hammond, Louisiana, about an insurance policy on Teronda and Whitney. Conley told agent Toni Pea that he wanted information on life insurance policies because the Louisiana Department of Human Services was requiring that he purchase insurance on one of his children. This statement was later proven to be false.

¶4. On April 20, 1994, Conley attempted to purchase a life insurance policy on Whitney and Teronda. State Farm agent Joyce Jones told Conley that Whitney and Teronda would have to be present in order to

complete the applications for life insurance. Conley left the State Farm office, visited Teronda, whom he had not seen in over a year, and persuaded her to go to State Farm with him to sign the necessary paperwork for the insurance. Conley purchased a $100,000 life insurance policy with an accidental death provision on three-year-old Whitney and named himself as the owner and beneficiary of the policy. In addition, Conley purchased the same type of life insurance policy on Teronda and named himself as the successor beneficiary after Whitney. Under the terms of the policies, if Teronda and Whitney were to die contemporaneously in an accident, Conley would receive $400,000 in life insurance proceeds.

¶5. Once the applications were signed, Conley asked Jones when the policy would go into effect. Jones told him that if he paid one month's premium the policy would be good for thirty days while the underwriting department checked out the policy. Conley then paid the first month's premium in cash.

¶6. On Saturday, May 21, 1994, Conley arrived at Teronda's home unannounced and invited Teronda and the children on a picnic. Teronda took her two sons, her nephew, and Whitney on the trip with Conley. Conley's cousin, Johnny Lewis, also went along. All eight traveled in a subcompact car with the children sitting on the laps of the adults. Teronda assumed they were going to Zemurray Park in Hammond, Louisiana. However, after they passed the final Hammond exit, Conley stated that they were going to Percy Quin State Park in Pike County, Mississippi. Conley then stopped at a convenience store in Mississippi and bought some beer, which he and Lewis began to drink.

¶7. After arriving at the park, Conley suggested that the group rent paddle boats. Teronda, who could not swim, did not want to go, but Conley convinced her that it would be fun. Park personnel placed child-sized life jackets on the children and adult-sized jackets on the adults. Conley, Teronda, Whitney, and Ken got into one boat, and the rest of the group got into another boat. During this outing, Conley traveled outside the roped-off paddle boat area. Teronda complained to Conley that they were going too far from the shore, but Conley refused to turn around.

¶8. After Conley paddled almost 3,000 feet from the shore, he stopped the boat. Conley then pushed Teronda, knocking Ken, who was in Teronda's lap, into the water. As Teronda attempted to pull Ken back into the boat, she noticed that Whitney was missing from the boat. Teronda then saw Whitney floating on her back with her head above the water with her life jacket on about twenty or thirty feet from the boat. At this time, Whitney was saying "Daddy, please help me. Daddy, please help me." Conley dove into the water to get Whitney. Teronda saw Conley take Whitney into his arms, go underwater, and pull Whitney down with him. After a few minutes, Conley surfaced with Whitney's life jacket in his hands. Conley claimed that he could not find Whitney but found the life jacket on the floor of the lake.

¶9. Several nearby fishermen saw the commotion at the paddle boat and went over to help. One fisherman searched for Whitney for an hour and a half. All of the witnesses testified that they never saw Conley in the water making any effort to find Whitney. Conley returned to the shore in the boat of Craig Crozier, a fisherman, who testified that Conley told him the missing child was not his but rather the child of a friend.

¶10. The next day Conley contacted State Farm Agent Jones to begin the process of collecting the benefits of Whitney's life insurance policy. On Monday, May 23, 1994, Whitney's body was recovered from the lake. Conley continued to call once a week attempting to determine when the proceeds would be paid.

¶11. Due to the bi-state location of the occurrence and the parties, both Pike County and Tangipahoa Parish authorities cooperated in the investigation. In addition, the authorities cooperated with State Farm

agents and employees who were conducting their own investigation. C.V. Glennis, then Sheriff of Pike County, repeatedly tried to contact Conley to take his statement, but Conley never made himself available for this purpose. However, on June 29, 1994, Conley gave a statement to State Farm employee Ruth Granning.

¶12. For the next couple of years, Conley tried to collect the proceeds of the policy. In 1996 State Farm notified Conley's attorney that it was going to interplead the funds into court and hold a trial on the issue of Conley's paternity of Whitney. Conley then offered to settle his claim for less than fifty cents on the dollar.

¶13. In August, 1997, Conley was indicted and charged with the murder of Whitney Berry while engaged in the commission of the crime of kidnapping on Count I and with the kidnapping of Teronda Berry on Count II. At trial, Teronda testified for the State. During cross-examination and then again on re-direct, Teronda admitted that she lied in statements she had given the police and State Farm about Whitney's death. She stated that she had been covering up for Conley because she cared for him and did not want him to get into trouble. At this point the defense counsel insisted that Teronda be read her *Miranda* rights and appointed an attorney. Teronda then asserted her Fifth Amendment rights in response to all further questions.

¶14. At the close of the trial, the jury returned a verdict of guilty of capital murder. Shortly thereafter the sentencing phase began. The State put on two witnesses and Conley one. The judge then excused the jury in order to discuss Conley's right to testify. Court was recessed for a short time so that Conley could confer with his counsel about this matter. Upon returning to the courtroom, Conley physically attacked the prosecutor, and chaos ensued. During this disturbance, the jury members, who were located in a room near the courtroom, expressed fear for their safety and asked that their room be locked. Ultimately order was restored, and the jury returned to the courtroom. The jury heard additional evidence and retired to consider the sentence. The jury was unable to reach a verdict as to sentence, so the court sentenced Conley to life without parole.

## DISCUSSION

### I. WHETHER THE CIRCUIT COURT ERRED IN ALLOWING THE STATE TO AMEND THE INDICTMENT BY CHANGING THE DATE OF THE ALLEGED CRIME FROM MAY 23, 1994, TO MAY 21, 1994.

¶15. On June 24, 1998, five days prior to trial, the State moved the circuit court to amend Conley's indictment, changing the date of the alleged crimes from "on or about May 23, 1994" to "on or about May 21, 1994." The circuit court found the amendment of the date to be an amendment as to form only and granted it on June 29, 1998, the day of the commencement of the trial. Conley admits that this issue is a "close call," but argues that he was prejudiced by this change.

¶16. The question of whether an indictment is fatally defective is an issue of law and enjoys a relatively broad standard of review by this Court. *Peterson v. State*, 671 So.2d 647, 652 (Miss.1996). A trial court has no authority to grant substantive amendments to indictments. *Baine v. State*, 604 So.2d 258, 260 (Miss. 1992). However, "unless time is an essential element or factor in the crime, an amendment to change the date on which the offense occurred is one of form only." *Id*. at 261.

¶17. In *Griffin v. State*, 540 So.2d 17, 21 (Miss. 1989), we stated:

The test of whether an accused is prejudiced by the amendment of an indictment or information has

been said to be whether or not a defense under the indictment or information as it originally stood would be equally available after the amendment is made and whether or not any evidence [the] accused might have would be equally applicable to the indictment or information in the one form as in the other; if the answer is in the affirmative, the amendment is one of form and not of substance.

¶18. Conley's defense for the amended indictment was exactly the same as for the original indictment; therefore, the amendment did not in any manner affect the theory or defense of his case. Conley's sole defense under both indictments was that the death of Whitney Berry was the result of an accident. The amendment to the indictment was merely a change as to form and did not in any way prejudice Conley. Therefore, the circuit court did not err in allowing the State to amend the date of the indictment.

### II. WHETHER THE STATE WAS IN VIOLATION OF UCCCR 4.04 AND 9.04, AS WELL AS THE LOCAL RULES OF RECIPROCAL DISCOVERY, CREATING PREJUDICE TO THE APPELLANT'S DEFENSE.

¶19. Early in this case, Conley filed a Request for Discovery and later filed a Supplemental Request for Discovery. Several discovery conferences were also held prior to trial. Conley admits that the State produced a "tremendous amount" of materials but argues that it did not produce everything it was required to produce under the Rules. Specifically, Conley states that the State did not produce "the initial investigation interviews at Percy Quin, the full work-up of the Percy Quin investigation, the Louisiana investigation, the 'Life Jacket' question, and the many and various oral interviews and conferences of the State, on both sides of the state line, and the various witnesses." Finally, Conley alleges that the State knew beforehand that Teronda was going to admit on the stand that she was an accessory after the fact to the murder of her daughter.

¶20. The circuit court found no proof of any prejudicial discovery violations by the State and explained that the "defendant is entitled to complete discovery, but is not entitled to a 'blow by blow' narrative of the State's trial preparation and investigation." This Court is limited in reversing a trial court's actions regarding discovery issues. We may reverse a trial judge's ruling regarding discovery issues only if we find an abuse of discretion. *Harkins v. Paschall*, 348 So.2d 1019, 1022 (Miss. 1977).

¶21. Rule 9.04 A of the Uniform Circuit and County Court Rules states in part:

[T]he prosecution must disclose to each defendant or to defendant's attorney, and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request and without the necessity of court order the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution:

1. Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved of each such witness and the substance of any oral statement made by any such witness. . . .

We have stated, "[t]he rules of criminal procedure in Mississippi do not require the defendant to ask about a question he had no idea he should ask. However, the rules do require the prosecution to produce the 'substance of any oral statement made by any such witness' to the defense." *Kolberg v. State*, 704 So.2d 1307, 1317 (Miss. 1997).

¶22. Conley does not specify what the State did not produce. Instead, he lists certain items and suggests that they must be out there somewhere. The record lacks sufficient evidence to indicate that these items even existed or, if they did exist, that they were not turned over to Conley's counsel. In fact, when the State questioned Conley's trial counsel in the post-trial hearing, he never suggested that these items were not made available to him. He simply stated that he would have taken a different approach in his cross-examination of Teronda if he had known what she was going to say. In Teronda's cross-examination at trial, she admitted she had lied in the previous statements she had given because she cared for Conley and did not want to get him in trouble. Conley produced no evidence that the State knew that Teronda was going to change her testimony in the middle of trial.

¶23. After Teronda's testimony, the court held a hearing on the alleged discovery violation by the State and found that no violation existed. The court stated:

[I]n this case, what is alleged is a discovery violation. I think the record is replete with showings by the State that discovery was complied with. There have been numerous hearings where the State furnished different things where exculpatory evidence was furnished and, in fact, what brought this all about was exculpatory evidence that was furnished by the State to the defendant. . . .

As far as a discovery violation, I find that there has been none. The fact that the defense is surprised, so was everybody else. . . I think the State was surprised. . . .

If the State had known this, and had any proof of this, then Ms. Teronda would have been a co-defendant and not a witness. I think that goes without saying.

¶24. During the hearing on post-trial motions, the circuit court again gave Conley ample opportunity to develop the record and produce any "real evidence" of these alleged discovery violations. No such evidence was ever produced by Conley. In fact, the circuit court judge referred to Conley's examination on this point as a "fishing expedition" rather than a production of evidence. Further, during post-trial hearings, both attorneys for the State testified under oath that they had provided Conley with all of their discoverable evidence and that neither knew Teronda was going to change her story on the stand until she testified that day.

¶25. Conley also argues that he was not informed until the hearing on the post-trial motions about a dinner meeting between Teronda and the State on the day before trial. However, the record from the post-trial motions hearing is clear that nothing of substance was discussed at that meeting that had not already been disclosed to the defendant. In *Porter v. State*, 564 So.2d 31, 34 (Miss. 1990), this Court stated that it is allowable for either the State or the defense to brief and prepare their witnesses prior to trial. The pre-trial dinner meeting between Teronda and the State was shown to be no more than a review of her testimony in preparation for trial.

¶26. Conley also argues that he was never provided with the original life jacket worn by Whitney. It is clear from the record that the actual life jacket worn by Whitney was not available to either the State or the defense and that the jury was informed that the life jackets used at trial were examples of the life jacket worn by Whitney. The record also shows that a sample life jacket was given to the defense for their inspection pursuant to the rules of discovery. This contention is meritless.

¶27. In conclusion, Conley was given ample opportunity at trial and again at the post-trial hearing to

produce evidence of these alleged discovery violations; yet he failed to produce proof of a single violation. The circuit court did not abuse its discretion in ruling for the State on these matters.

### III. WHETHER THE CIRCUIT COURT ERRED IN LIMITING THE CROSS-EXAMINATION OF STATE'S WITNESS TERONDA BERRY, CONCERNING THE INCONSISTENCIES IN HER STATEMENTS AT TRIAL AND IN PRIOR, RECORDED STATEMENTS.

¶28. This issue is not properly before the Court pursuant to M.R.A.P 28(a)(6) which states that an argument in the appellate's brief "shall contain the contentions of appellant with respect to the issue presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied upon." *See also* **Hoops v. State**, 681 So.2d 521, 535 (Miss. 1996); **Pate v. State**, 419 So.2d 1324, 1325-26 (Miss. 1982). Conley has failed to cite any specific instance in the record where the trial court limited the cross-examination of Teronda.

¶29. The record indicates that Conley was given wide latitude in his cross-examination of Teronda and that he was specifically permitted to question her on the inconsistencies of her prior statements. The record contains over sixty-five pages of the cross-examination of Teronda where defense counsel drilled Teronda on the inconsistencies of her statements and forced her time and time again to admit she had previously lied. The record shows that it was during this cross-examination that Teronda first admitted that she was covering for Conley because she cared for him. Conley does not cite any specific instance in the record where cross-examination was limited because it simply did not occur. This argument is contrary to the record and without merit.

### IV. WHETHER THE CIRCUIT COURT ERRED IN NOT ALLOWING A FULL CROSS-EXAMINATION OF STATE'S WITNESS, TERONDA BERRY, AS TO ANY CONSIDERATION OR LENIENCY GIVEN HER IN EXCHANGE FOR HER TESTIMONY AT TRIAL.

¶30. Pursuant to M.R.A.P. 28(a)(6), this issue is not properly before the Court. Conley has failed to cite any specific instance in the record where the trial court limited his cross-examination of Teronda regarding any leniency given to her in exchange for her testimony. Further, the record shows no attempt by Conley to impeach Teronda on this issue. In order for an issue to be raised on appeal, there must be some basis for it in the record.

¶31. Conley argues that the State had doubts as to Teronda's culpability yet still chose not to prosecute her until after the trial. Conley argues that this decision not to prosecute Teronda was a "gift" of leniency by the State. The record simply does not support this argument.

¶32. At the time Teronda testified at trial, the State knew that Teronda's statements had been inconsistent over the years but had no proof that she might have been involved in the cover-up of the murder. The State learned that Teronda was covering for Conley during defense counsel's cross-examination. In the post-trial hearing, William E. Goodwin, the assistant district attorney, testified under oath that no one in the district attorney's office, the Tangipahoa Parish Sheriff's Office, or the Pike County Sheriff's Office offered Teronda any leniency or consideration for her testimony. In fact, as a result of Teronda's testimony at trial, she was later prosecuted as an accessory after the fact to the murder of Whitney and sentenced to five years probation. It is evident that Conley did not cite any specific instance in the record where cross-examination

of Teronda was limited as to leniency because it simply did not occur. Conley's argument is not supported by the record and is, thus, without merit.

### V. WHETHER THE CIRCUIT COURT ERRED IN ALLOWING REPEATED QUESTIONS BY THE STATE, OVER OBJECTION, AFTER ITS WITNESS, TERONDA BERRY HAD INVOKED HER FIFTH AMENDMENT RIGHTS.

¶33. Teronda Berry stated on cross-examination as follows regarding her knowledge of Conley's criminal acts:

> Berry: During the time that I was taking this deposition I really did care for Glen during the time I had took this deposition. And I didn't want to jeopardize anything that would happen to him.
>
> Mr. Bass [attorney for Conley]: Wait now. Now, so what you're saying now, Ms. Berry, is that you made all these statements to the sheriff and Mrs. Lowery because you cared for Glen?
>
> Berry: Yes, sir.
>
> Mr. Bass: And you didn't want to jeopardize him?
>
> Berry: Yes, sir.
>
> Mr. Bass: Who told you to say that?
>
> Berry: Nobody.

On redirect, following the cross-examination, the following was elicited:

> Mr. Goodwin [assistant district attorney]: Ms. Berry, you knew about this, didn't you?
>
> Berry: Knew about what?
>
> Mr. Goodwin: You knew about what was happening out at the lake that day, didn't you?
>
> Berry: What? What happened to Whitney?
>
> Mr. Goodwin: Yes?
>
> Berry: Yes?
>
> Mr. Goodwin: Thank you. I'm glad that you finally admitted that. When you gave this statement on the 22nd, you were covering up for Glen Conley, weren't you?
>
> Berry: Yes, sir, I was.

Thereafter, Teronda was appointed counsel due to her own possible criminal liability. She was excused with directions to return the next morning to complete her examination. She fled the State, was captured and completed her testimony on July 2, 1998, assisted by her appointed counsel. The following questions were asked by the State on re-direct:

> Ms. Berry, you and Mr. Conley were going to split the money from the insurance, weren't you?

Ms. Berry, Whitney was not saying out there help me Daddy, help me, she was saying help me, Mama, help me, wasn't she?

Glen promised to marry you, didn't he?

You were in love with Glen Conley, weren't you?

For the last four years, Ms. Berry, at every opportunity, you have covered up for Glen Conley, haven't you?

¶34. In response to each of these questions, Teronda asserted her Fifth Amendment right against self-incrimination. Defense counsel objected to this line of questioning as being improper redirect.

¶35. Conley asserts that the circuit court erred in allowing the prosecution to ask the preceding questions and thereby "testify" before the jury using a "silent witness." He argues that such actions violate the Confrontation Clause since the prosecution cannot be cross-examined by the defendant about the "silent witness'" testimony.

¶36. "The scope of re-direct examination, while largely within the discretion of the trial court, is limited to matters brought out during cross-examination." *Blue v. State*, 674 So.2d 1184, 1212 (Miss. 1996). "Also, we will not disturb a trial court's ruling on matters pertaining to redirect examination unless there has been a clear abuse of discretion." *Id.*

¶37. Conley cites *Balfour v. State*, 598 So.2d 731, 753 (Miss. 1992), in support of his argument. In *Balfour*, the defense called a co-conspirator, Payne, who testified as to his name and age and then invoked his Fifth Amendment right in response to all other questions. *Id.* at 748. The prosecution cross-examined Payne with a series of questions about a confession he had given to the police to which he again responded by invoking his Fifth Amendment rights. *Id.* at 751. This Court stated:

> [o]n direct-examination, Payne's testimony yielded nothing, and the prosecutor is precluded from picking up the gauntlet and testifying for Payne. For when the prosecutor, through the use of leading questions, parades before the jury the 'testimony' of the silent witness, such action violates the Confrontation Clause since the prosecutor cannot take the stand to be cross-examined by the defendant about the silent witness's 'testimony.'

*Id.* at 753. We explained that "when a witness invokes the Fifth Amendment, his silence does not constitute a denial which may be impeached. Therefore, Payne could not be impeached by the State for the confession statement which he gave." *Id.* at 751. However, if Payne had testified and related a different version of events from his statement, then the prosecution could have impeached Payne. *Id.*

¶38. The State cites *Hughes v. State*, 735 So.2d 238, 279 (Miss. 1999), in support of its argument that the re-direct of Teronda was proper. In *Hughes*, we held that the trial judge did not abuse his discretion in allowing the State to use leading questions when the witness "was the very paradigm of a hostile witness." The Court stated that "[h]er testimony not only deviated substantially from her pretrial prior statement, but was also inconsistent during both direct and cross-examination. The State was justified in attempting to pin [the witness] down with one version of her story or the other; and, the trial judge was correct in allowing leading questions to this effect." *Id.* The State contends that at this point in the trial, Teronda had become a

hostile witness, closely identified with the defendant and, therefore, subject to examination by leading questions.

¶39. The case at hand is easily distinguished from *Balfour*, cited by Conley. In *Balfour*, the witness had invoked his Fifth Amendment rights to every question except his name and age. We held that the prosecutor could not testify for a "silent witness." However, in this case, Teronda was anything but a silent witness. At this point in the trial Teronda had given numerous inconsistent statements incriminating both herself and Conley. Conley even refers to Teronda as a co-defendant at various points throughout his brief. Before Teronda's re-direct, she had testified for nearly a day and had been impeached on numerous occasions by both parties. At no time prior had she invoked the Fifth Amendment. Under both *Balfour* and *Hughes*, Teronda falls within the class of witnesses where impeachment by leading questions would be proper. The State had a right to try to pin Teronda down on the many inconsistent statements that she had given. For the above-mentioned reasons, we find no abuse of discretion by the trial court on this issue.

### VI. WHETHER THE CIRCUIT COURT ERRED IN ADMITTING PRIOR STATEMENTS OF TERONDA BERRY AND GLEN CONLEY THROUGH OTHER WITNESSES IN VIOLATION OF MRE 803(24).

¶40. This issue constitutes two distinct issues of fact and law. Hence, we address each separately.

### Conley's Statement

¶41. The objection now raised on appeal by Conley, that the trial court failed to make a finding on the factors contained in M.R.E. 803(24), is not the objection he made at trial. At trial, the defense counsel objected to Conley's statement being admitted because he had not been given his *Miranda* warnings and did not sign the statement. In instances where an objection is made to the introduction of evidence, the objection raised at trial must be the same as raised on appeal. If not, the issue is not properly preserved. *Puckett v. State*, 737 So.2d 323, 349 (Miss. 1999). Therefore, this issue is not properly before this Court. However, even if this issue were properly before the Court, it is without merit.

¶42. Conley made a statement to Ruth Granning of State Farm on June 29, 1994, in an effort to recover the life insurance proceeds. This is the only extant account of Conley's version of the events of May 21, 1994, inasmuch as Conley refused to speak with law enforcement officials for the next three and one-half years. The State offered Conley's statement through the testimony of Granning.

¶43. The admission of Conley's statement to State Farm is admissible pursuant to M.R.E. 801(d)(2), Admission by Party-Opponent, which reads in pertinent part: "A statement is not hearsay if . . . the statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity. . . ." It is clear that Conley is a party-opponent and that it is his own statement which is being offered against him. In *Thornhill v. State*, 561 So.2d 1025, 1029 (Miss. 1989), we held that a statement is not hearsay if it is the party's own statement offered against him. It is irrelevant that the defendant did not intend it to be a statement against interest and that it was self-serving when made. *Id.* Conley's statement was properly admitted.

### Teronda's Statement

¶44. Teronda also made a statement to Ruth Granning of State Farm on June 29, 1994, in an effort to recover the life insurance proceeds. The State offered this statement into evidence through the testimony of

Granning. It should be noted that by the time Granning testified, Teronda had become unavailable for further testimony.

¶45. The State contends that this statement is admissible under M.R.E. 801(d)(1). M.R.E 801(d)(1) states, in pertinent part:

> A statement is not hearsay if:
>
> The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive. . . .

¶46. The State argues that the testimony Teronda gave on direct examination was wholly consistent with the statement in question and that it was being offered by the State to refute an expressed or implied claim of recent fabrication. It is clear from the record that during the defense counsel's cross-examination of Teronda, he was accusing her of recent fabrication. He asked Teronda several times if she was lying now or then.

¶47. Though the statement in issue is consistent with Teronda's prior testimony and was offered to rebut a charge of recent fabrication, it was not the statement upon which she was cross-examined. The statement in issue is one given to State Farm. The statement upon which Teronda was cross-examined was an entirely different statement. This point in the trial was the first time the State Farm statement was introduced.

¶48. In *Jackson v. State*, 766 So.2d 795, 808 (Miss. Ct. App. 2000), the Mississippi Court of Appeals addressed this exact issue. In *Jackson*, a witness for the State was cross-examined on an unsworn statement she had given to the sheriff. This statement was inconsistent with her testimony on direct. On re-direct the State questioned the witness about a second sworn statement she had given to the sheriff. The court found that the defense had elicited information from the witness on cross-examination that was inconsistent with her prior trial testimony, and pursuant to M.R.E. 801(d)(1), this opened the door for the State to elicit a prior consistent statement from its witness to rebut the defense's implied charge of recent fabrication. The court of appeals held that the trial judge did not abuse his discretion in allowing the witness to testify as to the sworn statement. We conclude likewise regarding Teronda's statement.

¶49. Conley also argues that he was denied the right to confront Teronda pursuant to the Confrontation Clause as found in the Sixth Amendment to the United States Constitution. In analyzing a hearsay statement that was admitted under Rule 803(24), we have found previously that no confrontation clause problem existed where the person who made the statement testified at trial. *Leatherwood v. State*, 548 So.2d 389, 402 (Miss. 1989). Likewise, no confrontation clause problems exists in the case sub judice. Teronda was fully examined by both the prosecution and the defense for an entire day of trial. It was Conley's confrontation and cross-examination of Teronda which caused her to admit her participation in the cover up of Whitney's murder. This argument is without merit.

### VII. WHETHER THE STATE, IN NOT CALLING ITS PRINCIPAL INVESTIGATING OFFICER AND WITNESS, CONNIE LOWERY RUCKER, TO TESTIFY, EFFECTIVELY DENIED THE APPELLANT HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS OF CONFRONTATION AND DUE PROCESS.

¶50. Conley argues that Connie Lowery Rucker was his primary accuser. Rucker was an investigator for

the juvenile division of the Louisiana State Police. Conley contends that because Rucker never testified at trial, he was denied his right to confront his accuser under the Sixth Amendment. Conley accuses the State of trying to "hide something" by not calling Rucker. Conley also asserts that he did not have an opportunity to speak with Rucker until the post-trial hearing. However, under this same assignment of error, Conley states that "in both Mississippi and Louisiana, from May 1994, to trial [Rucker] was just everywhere" and also states that she was present at the entire trial. It appears from the record that Conley never had Rucker on his potential witness list nor did he ever attempt to take her deposition.

¶51. At a motions hearing held on October 6, 1998, not once did Rucker's testimony indicate that she was not available to the defense for questioning. Further, when defense trial counsel, M.A. Bass, testified in post-trial, he gave no indication that Rucker had not made herself available to him.

¶52. "In all criminal prosecutions, state as well as federal, the accused has a right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, to be confronted with the witnesses against him."*Lilly v. Virginia*, 527 U.S. 116, 123 119 S. Ct. 1887, 1893, 144 L. Ed. 2d 117 (1999). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."*Id.* However, neither the appellant nor the court may instruct the State as to which witnesses that party shall put on the stand or how that party shall present its case. *Ahmad v. State*, 603 So.2d 843, 847 (Miss. 1992); *Hickson v. State*, 512 So.2d 1, 3 (Miss. 1987).

¶53. Conley urges this Court to find reversible error because his constitutional right to confront his accuser, Rucker, was denied. While he is correct that the Sixth Amendment of the U.S. Constitution guarantees a defendant the right to confront an accuser which includes the right of cross-examination, Conley was not deprived of that right. The State was not required to present all of its witnesses, although Conley did have the right to cross-examine any witness the State did present. The record reveals that Conley was allowed to fully cross-examine all of the State's witnesses who testified against him. Rucker was not a witness at the trial, and there is no indication in the record that she ever accused Conley of murdering Whitney. Therefore, Conley was not denied his Sixth and Fourteenth Amendment Rights of confronting his accuser, and this issue is without merit.

### VIII. WHETHER THE STATE'S WITNESS, CONNIE LOWERY RUCKER, WRONGFULLY SPOKE TO OTHER STATE WITNESSES WHILE BEING SEQUESTERED TO THE PREJUDICE OF THE APPELLANT.

¶54. Conley alleges that the State ordered Rucker to coach and intimidate the other potential witnesses while they were sequestered. There is absolutely no evidence in the record to support these accusations. However, there is some contradicted testimony of whether Rucker spoke about the trial with another witness during sequestration. During post-trial hearings, Conley's former wife, Vernice Kelly, testified that Rucker quizzed her about her belief in the guilt or innocence of Conley, and that Rucker told her that Teronda was "stupid -- fell off a turnip truck" while they were sequestered in the witness room. However, during the post-trial hearings, Rucker denied making this statement about Teronda and denied quizzing Kelly. We note that the record establishes that between the date of the trial and the post-trial hearing, Kelly had an affair with Rucker's husband. By the time of the post-trial testimony, Rucker was getting a divorce from her husband, and Kelly was living with him.

¶55. The record reveals that neither Rucker nor Kelly were ever called to testify at trial. Therefore, even if

the sequestration rule had been violated, it was harmless error since it is "clear beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Stokes v. State*, 548 So.2d 118, 124 (Miss. 1989). A technical violation of the rule is harmless where the violation did not adversely affect the defendant. *Id.*

¶56. Also under this proposition, Conley argues that Rucker violated the sequestration rules by speaking with the State's attorneys during a break in the trial. Attorney Dan Smith testified that he and Goodwin spoke with Rucker during a break in testimony to get her opinion on how they should proceed with the re-direct examination of Teronda because Rucker knew Teronda personally. The trial court found that the sequestration rule had not been violated. Had the court found that a violation of sequestration existed, the remedy would have been to not allow the witness to testify. *See Douglas v. State*, 525 So.2d 1312, 1317 (Miss. 1988). Since Rucker was never called to the witness stand by the prosecution or the defense, any violation of the sequestration rule as far as Rucker is concerned is harmless error.

> ### IX. WHETHER THE ROLE PLAYED IN THE INVESTIGATION AND PROSECUTION OF THIS CASE AGAINST THE APPELLANT BY STATE FARM INSURANCE COMPANY, ITS OFFICERS, EMPLOYEES AND AGENTS, IS A SUBVERSION OF THE CRIMINAL PROCESS, AND A DENIAL OF THE APPELLANT'S FOURTH, FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS.

¶57. This issue is procedurally barred as it is being raised for the first time on appeal. It is well-settled that a trial court will not be found in error on an issue upon which it was never requested to rule. *Stidham v. State*, 750 So.2d 1238, 1242 (Miss. 1999). However, even if this issue had been properly preserved for appeal, it is without merit.

¶58. Conley argues that the police investigation of this capital murder was "literally turned over" to State Farm, an interested civilian entity. Conley asserts that this abdication of the investigation to a civilian entity violated his Fourth, Fifth, Sixth, and Fourteenth Amendment rights.

¶59. This specific issue is one of first impression in Mississippi. It is therefore helpful to review the law of other jurisdictions for guidance. Our sister state of Alabama concluded that as a general principle, the limited use of civilians in the context of criminal investigations, under the direct and continuing supervision of responsible law enforcement officials is allowed. *Drill Parts & Serv. Co. v. Joy Mfg. Co.*, 619 So.2d 1280, 1286 (Ala. 1993). In *Commonwealth v. Sbordone*, 678 N.E.2d 1184, 1188 (Mass. 1997), the Supreme Judicial Court of Massachusetts held that the police are not prohibited from utilizing civilians "in appropriate circumstances" where such assistance "is necessary or will materially assist the police . . . ." This case dealt with civilian assistance during the execution of a search warrant. *Id.* The court noted that any civilian participation must be closely supervised by the police and restricted to those acts within the civilian's special area of expertise. *Id.* at 1189.

¶60. "There are also many sound policy reasons for holding the police responsible for appropriately limiting a civilian's role in the conduct of a warranted search." *Id.* "[U]nlike civilians, police officers have taken an oath to uphold federal and state constitutions and laws and are trained to conduct a search lawfully and in accordance with the provisions of a warrant . . . and, unlike sworn police officers, civilians are not subject to departmental discipline for any failure to adhere to the law." *Id.* "This oath is of no small moment as a protection to our citizens when their privacy is lawfully intruded upon by a search pursuant to a warrant." *Morris v. State*, 622 So.2d 67, 69 (Fla. Dist. Ct. App. 1993).

¶61. Conley admits that many policy arguments support civilian participation in criminal investigations. Civilian programs across the country, such as "Crimestoppers," have helped to put thousands of criminals behind bars. Also, many times concerned citizens will volunteer information to law enforcement officials about criminal activity and the individuals involved.

¶62. Conley asserts that a review of the entire record reveals State Farm's lead role in the investigation. He points out that of the State's seventeen witnesses, seven were "the direct result of, investigated by, and produced by State Farm employees," and that eleven of the State's twenty-four exhibits were directly produced by State Farm employees. The sheriff of Pike County also stated at trial, "Well, I'd call them [State Farm] to see if they had come up with anything and they would call me to see if I had came up with anything new."

¶63. As for the witnesses and exhibits referred to above, the State argues that while these witnesses were indeed investigated by State Farm, the State also conducted its own separate investigation and interviews of these witnesses. However, the State readily admits that State Farm aided in the investigation of this murder. State Farm's help became necessary when Conley refused to give a statement to anyone other than State Farm despite several requests from the Pike County Sheriff's Department. Both the State and State Farm suspected foul play and therefore shared information in the case.

¶64. After reviewing the authority from other jurisdictions, we feel the better rule would allow civilian entities to participate in criminal investigations up to the point where further investigation would require judicial or legal authority. A civilian's investigation must stop short of invading the defendant's constitutional rights. The record in this case simply does not support the proposition that State Farm's investigation progressed to the point that required judicial or legal authority. State Farm's investigation consisted of interviewing voluntary witnesses, sharing information with the sheriff's department, and staying "in touch" with the police. State Farm's participation in the investigation simply does not constitute a violation of Conley's constitutional rights. Therefore, this assignment of error is without merit.

### X. WHETHER THE CIRCUIT COURT ERRED IN DENYING THE APPELLANT'S PROFFERED JURY INSTRUCTION D-28.

¶65. Conley argues the trial judge committed reversible error when he refused to grant jury instruction D-28, a so-called "two theory" charge, which reads as follows:

> The Court instructs the Jury that if there be any fact or circumstances in this case susceptible of two interpretations, one favorable and the other unfavorable to the Defendant, and when the Jury has considered such fact or circumstance with all the other evidence, if there is a reasonable doubt as to the correct interpretation, they must resolve such doubt in favor of the Defendant and place upon such fact or circumstance the interpretation favorable to the Defendant.

¶66. We addressed this exact instruction in *Petti v. State*, 666 So.2d 754, 756-57 (Miss. 1995). In affirming the trial court's refusal to grant the jury instruction, we stated that we have "held on numerous occasions that it is only in cases consisting entirely of circumstantial evidence that an instruction must be given which requires the jury to resolve, in favor of the accused, doubt over circumstances susceptible of two interpretations." *Id.* at 757 (citing *Medley v. State*, 600 So.2d 957 (Miss. 1992); *Barnes v. State*, 532 So.2d 1231 (Miss. 1988)). Where the evidence is purely circumstantial, the trial court must grant a

"two-theory" instruction. ***Id.*** (citing ***Parker v. State***, 606 So.2d 1132, 1140-41 (Miss. 1992); ***Henderson v. State***, 453 So.2d 708, 710 (Miss. 1984)).

¶67. The State's case was not built entirely of circumstantial evidence. Teronda Berry testified that she saw Whitney floating with her head above the water with her life jacket on and that she then saw Conley pull Whitney under the water with him. She further testified that Conley surfaced holding the life jacket and stating that he could not find Whitney. This testimony obviated the necessity for the defendant's proffered instruction. We find no error in the trial court's refusal to grant the two-theory instruction.

### XI. WHETHER THE CIRCUIT COURT ERRED IN DENYING THE APPELLANT'S PROFFERED JURY INSTRUCTION D-30, ON THE LESSER INCLUDED OFFENSE OF MANSLAUGHTER.

¶68. Conley argues the trial judge committed reversible error when he refused to grant jury instruction D-30, a manslaughter instruction, which reads as follows:

Glen Conley has been charged with murder of Whitney Berry in Count No. 1 of the indictment. The lesser-included offense of this crime is manslaughter.

If you find from the evidence in this case beyond a reasonable doubt that:

1. Glen Conley, on or about May 21, 1994 in Pike County, Mississippi,

2. killed Whitney Berry

3. by drowning her, and

4. Glen Conley was negligent and the negligence was so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life, and

5. such negligence, if any, directly caused the death of Whitney Berry and further the drowning was not accidental

then you shall find the defendant guilty of manslaughter.

If the prosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find Glen Conley not guilty of the lesser included offense of manslaughter.

¶69. The trial judge held that this instruction was included in State's instruction S-2 which was granted. Instruction S-2 reads, in pertinent part:

The Court further instructs the Jury that if all twelve of you are unable to unanimously agree on the above charges, you may consider the lesser-included offense of manslaughter by culpable negligence.

If you believe from the evidence in this case, beyond a reasonable doubt, that the defendant did unlawfully, feloniously and by his culpable negligence kill and slay one Whitney Berry, a human being, by then and there removing the personal flotation device from the said Whitney Berry, a human being, contrary to Mississippi law, and did allow the said Whitney Berry to enter the water without sufficient

protection, then you should find the defendant guilty of manslaughter by culpable negligence, and the form of your verdict, which should be written on a separate sheet of paper and need not be signed, may be in the following form:

"We, the Jury, find the defendant guilty of manslaughter by culpable negligence."

The Court further instructs the Jury that if you find the defendant not guilty of manslaughter by culpable negligence, the form of your verdict may be in the following form:

"We, the Jury, find the defendant not guilty of manslaughter by culpable negligence."

¶70. The State contends that this instruction properly sets out the standards for a negligence theory and that when read with all of the other instructions, the jury was properly instructed. However, it appears that the State's instruction failed to provide a proper guide for the jury. In *Grinnell v. State*, 230 So.2d 555, 558 (Miss. 1970), this Court defined culpable negligence as follows:

[T]he term culpable negligence should be construed to mean a negligence of a higher degree than that which in civil cases is held to be gross negligence, and must be a negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life, and that this shall be so clearly evidenced as to place it beyond every reasonable doubt.

The State's instruction fails to properly and fully define culpable negligence. Conley's denied jury instruction, however, comes closer to meeting the definitional standard set out in *Grinnell* and, therefore, may have been erroneously denied.

¶71. *Grinnell*, however, was an automobile accident case where the task for the jury was to determine whether Grinnell's conduct arose to the level of culpability. The choice was between guilt or innocence of manslaughter, and the jury found guilt of manslaughter. In the present case, the jury was allowed to find guilt of manslaughter and chose not to do so. Therefore, the failure of the instruction to include an adequate definition of culpable negligence is harmless.

¶72. The error did not contribute to the verdict as the jury unanimously agreed that Conley murdered Whitney Berry while engaged in the crime of kidnapping. Error is harmless if it is clear beyond a reasonable doubt that it did not contribute to the verdict. *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Therefore, although the trial court may have erred in refusing to grant Conley's manslaughter instruction containing an adequate definition of culpable negligence, it was harmless error.

## KIDNAPPING[2]

¶73. The State asserts that Conley's assignments of error regarding the kidnapping of Whitney Berry are procedurally barred because Conley failed to properly bring these issues before the trial court. We agree that the assignments of error are barred. We, nevertheless, choose to review the kidnapping issue in the case sub judice.

¶74. The statute defining kidnapping, Miss. Code Ann. § 97-3-53 (2000), states:

Any person who shall without lawful authority forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be secretly confined or

imprisoned against his or her will, or shall without lawful authority forcibly seize, inveigle or kidnap any child under the age of ten (10) years and secretly confine such child against the will of the parents or guardian or person having the lawful custody of such child, shall, upon conviction, be imprisoned for life in the state penitentiary if the punishment is so fixed by the jury in its verdict....

We revisited this statute in *Hughes v. State*, 401 So. 2d 1100, 1105 (Miss. 1981), where we stated:

In order to clearly set forth the different elements which may constitute kidnapping under the state [sic], we restate the statute as follows:

Every person who shall, without lawful authority,

(1) forcibly seize and confine any other,

(2) or shall inveigle or kidnap any other

(3) with intent

(a) to cause such person to be secretly confined or imprisoned in the state against his will,

(b) or to cause such other person to be sent out of this state against his will,

(c) or to cause such other person

(1) to be deprived of his liberty,

(2) or in any way held to service against his will. . . .

Under the statute the State must prove that a person, without lawful authority, either (1) forcibly seized and confined another person, or (2) inveigled or kidnapped another person, intending to subject such other person to either (a), (b), or (c) above.

*Id.*

¶75. The kidnapping issue reveals itself in a number of ways in this case. First, Conley argues that his jury instruction on the issue was improperly denied. Second, he argues that the State's instructions, which were granted, were incorrect and that the court's instruction gave undue prominence to an issue unsupported by the evidence. Third, he asserts that the jury verdict as to the kidnapping is against the overwhelming weight of the evidence and contrary to the law of this state. Finally, he contends that the jury verdict as to the kidnapping of Whitney Berry is inconsistent with the dismissal of the State's related charge of the kidnapping of Teronda Berry.

¶76. With Instruction S-1, the circuit judge submitted the issue of kidnapping to the jury. Instruction S-1 states that "[k]idnapping is the seizure and confinement of a person without lawful authority either by force or by trickery." Absent from the instruction is the element of intent to "secretly confine."

¶77. We must examine the alleged jury instruction errors in conjunction with Conley's weight of the evidence argument because all are affected by a problematic line of our cases dealing with the law on kidnapping. In *Chevalier v. State*, 730 So. 2d 1111, 1115 (Miss. 1998), we reversed a kidnapping conviction because the jury instruction failed to include the element of intent to secretly confine or imprison

the victim. Similarly, in *Aikerson v. State*, 274 So. 2d 124 (Miss. 1973), this Court reversed a kidnapping conviction because the indictment, like the jury instruction in *Chevalier*, failed to adequately set out the element of intent to secretly confine or imprison the victim. These cases are in conflict with another line of authorities which dismiss any requirement for a showing that the detention was with the intent to "secretly" confine. *See, e.g.*, *Buckley v. State*, 223 So. 2d 524, 527 (Miss. 1969) (holding that an indictment in a kidnapping prosecution was not fatally defective because it failed to state that the victim was forcibly seized and confined or that he was secretly confined or imprisoned).

¶78. Contributing further to the confusion in our kidnapping law, the Court in *Chevalier* insisted that "our kidnapping statute requires more than intentional seizing or confining, it requires such acts with a specific intent."*Chevalier*, 730 So. 2d at 1115. This statement is in direct conflict with our holding in *Williams v. State*, 684 So. 2d 1179, 1188 (Miss. 1996), where we stated, "as kidnapping is not a specific intent crime, it is sufficient that the circumstances resulted in such a manner as to effect a kidnapping as opposed to an actual intent to kidnap, i.e., it is not necessary to establish the mental state of intent by direct evidence."*Id.* (quoting *Williams v. State*, 544 So. 2d 782, 789 (Miss. 1987)).

¶79. The holding in *Chevalier* is also in conflict with our holding in *Wilcher v. State*, 448 So. 2d 927 (Miss. 1984). In *Wilcher* the defendant confessed that he intentionally gave his victims wrong directions to his home so as to get them into a deserted place where he intended to rob them. *Id.* at 935. The victims followed his directions; he killed and robbed them. *Id.* We determined that the confession made a jury issue on whether Wilcher by his trickery intended to cause his victims to be confined against their will even though no actual secrecy was involved. *Id.*

¶80. We can no longer ask prosecutors and defendants to muddle through this conflicting law. We must choose one direction. The statute as written must be read in its plainest meaning. If we apply common means of analyzing sentence structure, we find that the adverb "secretly" modifies the verb immediately following. With this reading the term "secretly confined" and the term "imprisoned" each stand alone as terms of art possessed of separate meanings.

¶81. The facts of this case, when read in conjunction with a rational interpretation of the statute, logically dictate the conclusion that one who is imprisoned by trickery will most likely not be secretly confined. No other conclusion can be reached by a fair reading of the statute. Victims are often confined in circumstances and places against their will, even though such confinement may not be in secrecy.

¶82. Considering the evidence in the case at bar in the light most favorable to the verdict, we cannot say that the State failed to make a sufficient showing of kidnapping in accordance with the requirements of the statute. The State presents its theory of the kidnapping as follows: "that the defendant tricked the victim into going on a picnic with him, then tricked her into coming to Mississippi, and then tricked her into getting on a boat all with the intent of killing her. It was an 'inveigling' theory." The imprisonment or confinement does not have to be a secret. Whitney and Teronda Berry were effectively confined at the time Conley took them in the paddle boat beyond the boundary ropes 3,000 feet from shore against their protestations as revealed by Teronda's testimony:

Q: What, if anything, did you tell Glen concerning you wanting to go back into shore?

A: I told Glen, let's go back because we was too far out into the water and I wanted to go back to shore. But he consisted [sic] he didn't want to go back. He said he was going to go on the other side.

\* \* \*

Q: Teronda, what, if anything, happened next?

A: As we was going out there beyond the poles, I keep consisting [sic] him-telling him, let's turn back around and go to shore. But he just kept saying no, we was [sic] going on the other side.

Conley's actions and refusal to return to shore reveal that he was acting against the will of Teronda and Whitney.

¶83. We have examined *Chevalier* and *Aikerson*, which are contrary to *Buckley*, *Williams*, and *Wilcher*, among others. Sound judicial principles dictate that we choose between these competing lines of authority. A plain reading of the statute leads to the sound conclusion that one may commit the crime of kidnapping either by secretly confining a victim or by confining or imprisoning another against his or her will regardless of whether the confinement is secret. Indeed, in most cases of trickery, as in the instant case, the victim's confinement will not be in secret. Therefore, to the extent that *Chevalier* and *Aikerson* are inconsistent with our holding today, such cases are hereby overruled.

¶84. Conley asserts that another instruction pertaining to the kidnapping issue was inappropriate in addition to those examined above. Instruction C-4 states, "The court instructs the jury that the term 'inveigle' means to trick or deceive." Conley submits that this instruction "so emphasize[s] a single element so as to cement a consideration in the jury's deliberations."

¶85. In *McLaurin v. Old S. Life Ins. Co.*, 334 So. 2d 361 (Miss. 1976), the insurer complained that a particular instruction gave undue emphasis to certain language which was detrimental to its case. This Court stated, "In our jurisprudence all jury instructions are considered in their entirety. . . . Though certain instructions granted were inartfully drafted, the deficiencies were not so gross as to prejudice the insurers' case when all instructions are considered together." *Id.* at 364. Thus, such an instruction as C-4, which simply defines a relevant term, does not give undue emphasis to that element of the State's case.

¶86. Conley asserts that the jury verdict as to the kidnapping of Whitney Berry is inconsistent with the dismissal of the State's related charge of the kidnapping of Teronda Berry. The State submits that it chose to dismiss this count of the indictment "when it became clear that [Teronda] was involved in the murder of Whitney, or at the very least in the cover-up." The State rebuts Conley's proposition by theorizing that Teronda could have been both a participant in the cover-up and a victim of kidnapping-that both possibilities could be true. Thus, the State continues to assert that Teronda was a victim of kidnapping even though it has dropped that particular charge against Conley. We agree that there is evidence which would have supported the conclusion that Teronda was kidnapped. However, there is no requirement that the State charge Conley with everything it possibly can. Therefore, we find no merit to Conley's argument.

### XIII. WHETHER THE CIRCUIT COURT ERRED IN GRANTING STATE'S JURY INSTRUCTION S-2 AS TO THE DEGREES OF HOMICIDE.

¶87. Conley argues the trial judge committed reversible error in granting the State's jury instruction S-2, which reads as follows:

The Court instructs the Jury that before you can reach a verdict in this case, all twelve of you must agree upon the same verdict. This means that any verdict of the Jury must be unanimous.

The Court further instructs the Jury that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant committed the crime of murder while in the commission of the crime of the kidnapping of one Whitney Berry, then you should find the defendant guilty of capital murder, and the form of your verdict, which should be written on a separate sheet of paper and need not be signed, may be in the following form:

"We, the Jury, find the defendant guilty of capital murder."

If all twelve of you are unable to unanimously agree as to a verdict on the guilt of the defendant of capital murder, you may consider the lesser-included offense of murder. A lesser-included offense is a charge which contains some elements of the greater charge but not all of them.

If you believe from the evidence in this case, beyond a reasonable doubt, that the defendant did wilfully, unlawfully, feloniously and of his malice aforethought kill and murder one Whitney Berry, a human being, but not while in the commission of the crime of kidnapping of the said Whitney Berry, then you should find the defendant guilty of murder, and the form of your verdict, which should be written on a separate sheet of paper and need not be signed, may be in the following form:

"We, the Jury, find the defendant guilty of murder."

The Court further instructs the Jury that if all twelve of you are unable to unanimously agree on the above charges, you may consider the lesser-included offense of manslaughter by culpable negligence.

If you believe from the evidence in this case, beyond a reasonable doubt, that the defendant did unlawfully, feloniously and by his culpable negligence kill and slay one Whitney Berry, a human being, by then and there removing the personal flotation device from the said Whitney Berry, a human being, contrary to Mississippi law, and did allow the said Whitney Berry to enter the water without sufficient protection, then you should find the defendant guilty of manslaughter by culpable negligence, and the form of your verdict, which should be written on a separate sheet of paper and need not be signed, may be in the following form:

"We, the Jury, find the defendant guilty of manslaughter by culpable negligence."

The Court further instructs the Jury that if you find the defendant not guilty of manslaughter by culpable negligence, the form of your verdict may be in the following form:

"We, the Jury, find the defendant not guilty of manslaughter by culpable negligence."

In its further explanation of the degrees of homicide, the court instructed the jury on the elements of capital murder as follows:

The Court instructs the Jury that the State has the burden of proving from the evidence beyond a reasonable doubt that Glen Conley did willfully, unlawfully, feloniously and of malice aforethought did kill and murder Whitney Berry at a time when Glen Conley was then and there engaged in the commission of the crime of kidnapping of Whitney Berry. If the state fails to prove each and every essential element or if the Jury believes from the facts that Glen Conley did not willfully, unlawfully, feloniously, with malice aforethought kill Whitney Berry then you should return a verdict of "not

guilty."

¶88. Conley asserts that instruction S-2 was lacking in the essential elements in each degree of homicide. He asserts that it would have been better to grant a series of "proper instructions," outlining the steps in each degree. Conley urges that S-2 failed to properly instruct the jury; yet, he fails to state how or in what manner the instruction is infirm other than making an allegation that certain elements of the crimes are excluded. Conley never specifies precisely to which elements he is referring. Jury instructions will always be considered as a whole as opposed to the singling out of any instruction. *Nicholson ex rel. Gollott v. State*, 672 So.2d 744, 752 (Miss. 1996).

¶89. As discussed in issue eleven, the portion of S-2 instructing the jury on manslaughter by culpable negligence was not proper. However, as the jury found Conley to be guilty of capital murder, this was determined to be harmless error. As for the remaining portion of S-2, this Court finds that the jury instructions, taken as a whole, properly instructed the jury as to the degrees of homicide. The instructions correctly placed the burden on the State to prove beyond a reasonable doubt every element of the underlying felony with which Conley was charged and for the charge of capital murder. Therefore, the trial court did not err in granting State's jury instruction S-2.

### XVII. THE JURY VERDICT OF CAPITAL MURDER IS TOTALLY WITHOUT BASIS IN LAW AND FACT AND THE RESULT OF BIAS AND PASSION ON THE PART OF THE JURY IN THIS CASE.

¶90. Conley asserts that the evidence of his guilt is abstract and highly circumstantial and does not rise to the level of proof beyond a reasonable doubt. He contends that the State presented irrelevant and highly prejudicial evidence and that his trial was fundamentally unfair. The State argues that the absence of bias and passion of the jury is evidenced by the fact that Conley is not sitting on death row.

¶91. Conley complains that, though not charged with pecuniary gain, he faced this presumption throughout the trial. Conley cites as further examples of prejudicial evidence Teronda's testimony regarding Conley's drinking beer and inviting his cousin Lewis to join the party the day of the drowning and the State's entering its "choice of life jackets." The State rebuts that the alleged motive, financial gain, is relevant in a murder case. Further the State asserts that testimony from those present at the scene is relevant.

¶92. This Court has stated:

It is error in the course of a trial where one is charged with a criminal offense for the State to inject extraneous and prejudicial matters and lay them before the jury. A combination of such instances may become fatal error and ground for reversal even though the court sustains objections to such questions. . . . One of the ingredients of a fair and impartial trial is that an accused person should be tried upon the merits of the case.

*McDonald v. State*, 285 So.2d 177, 180 (Miss. 1973). We find that the evidence cited by Conley does not rise to the type of error contemplated by this Court in *McDonald*. Therefore, we find this assignment of error to be without merit.

### XVIII. THE CUMULATION OF ERROR IN THIS TRIAL REQUIRES REVERSAL.

¶93. Conley asserts that his case was "replete with . . . 'near errors.' The gaps in transcription, the lack of

the real life jacket, the denial of expert witnesses, the tri-parte investigation and its lack of accountability to name a few." He argues that, taken individually, these errors may be considered harmless; taken collectively in combination with the "major areas of dispute," they are fatal.

¶94. The State takes note of Conley's failure to support his contentions with citations to the record. The State asserts that nowhere in the record is evidence that Conley was denied expert witnesses, and he never listed such denial as an assignment of error. The State also points out that nowhere in the record is it asserted that the transcript is incomplete.

¶95. We have recognized that a case may be reversed because of the accumulation of errors, which, standing alone, would be insufficient for reversal. *Stringer v. State*, 500 So. 2d 928, 946 (Miss. 1986). In this case, however, we find that Conley has failed to establish cumulative error upon which to base a reversal. Therefore, this issue is without merit.

### XIX. THE CIRCUIT COURT ERRED IN NOT ALLOWING A MINIMAL "COOLING-OFF" PERIOD FOR THE JURY IN THIS CASE BETWEEN THE GUILT PHASE AND THE PENALTY PHASE OF THE TRIAL.

¶96. Conley submits that the trial court erred in not granting an adequate cooling-off period between the guilt and sentencing phases.[(3)] After the jury returned its verdict and was recessed from the courtroom, the trial judge noted that it was 2:20 in the afternoon. The judge then recessed the court until 3:00. There is some discrepancy as to the ultimate actual length of time between the guilt phase and sentencing phase. One prosecutor stated on record that it was approximately two hours and fifteen minutes to two hours and thirty minutes between the two phases of the trial. Conley asserts that only approximately thirty minutes lapsed between the two phases. The judge stated that, since the next day was Saturday and the 4th of July, he could not recess the case for the day. Mississippi's statutory scheme concerning the guilt and sentencing phases of a capital murder trial provides only that "[t]he proceeding shall be conducted by the trial judge before the trial jury as soon as practicable." *McGilberry v. State*, 741 So. 2d 894, 919 (Miss. 1999) (quoting Miss. Code Ann. § 99-19-101(1) (1994)). Ordinarily, trial judges have broad discretion in determining how long trials last on any given day. *Id.* (citing *Edge v. State*, 393 So.2d 1337, 1342 (Miss.1981)). We have held that, in utilizing this discretion, trial judges should keep in mind the mental and physical toll that litigation takes on the lawyers involved and the defendant's right to effective assistance of counsel. *Id.*

¶97. The trial judge in *McGilberry* allowed only a 15-minute recess between the guilt and sentencing phases of a trial that resulted in the defendant's being sentenced to death. *Id.* at 919. The judge, in denying the motion for a cooling-off period, noted that it was the middle of the day, the jury had already eaten lunch, and he did not see any reason for a cooling-off period. *Id.* We found the defendant's assignment of error regarding the judge's overruling of the motion to be without merit and ultimately upheld the verdict and sentence. *Id.*

¶98. Conley urges this Court to consider that, except on joint motion of the parties, the State of Louisiana requires a minimum of twelve hours between the guilt verdict and the commencement of the penalty phase in a capital trial. La. Code Crim. Proc. art. 905 (1997). He also asserts that the general practice is to begin the penalty phase on the next day after a guilty verdict but cites no authority for this point.

¶99. The State submits that the purpose of a cooling-off period is to prevent a jury from voting in the heat

of passion to execute a defendant. Thus, according to the State's assertion, Conley's argument is misplaced since Conley was not sentenced to death. The State, however, cites no authority to back this proposition.

¶100. In light of our holding in *McGilberry*, we find that this assignment of error is without merit. Although the precise time period is uncertain, at least thirty minutes to two hours and thirty minutes lapsed between the two phases of Conley's trial. The cooling-off period in *McGilberry* was only fifteen minutes. As to our adopting the Louisiana approach to the issue, we believe that such a policy decision would be more appropriately accomplished by the Legislature. Even Conley recognizes that Louisiana's cooling-off guidelines are statutorily imposed.

### XX. THE CIRCUIT COURT ERRED IN ALLOWING, OVER OBJECTIONS, TESTIMONY AS TO PREVIOUS UNRELATED CHARGES AND UNPROVEN MISDEMEANOR CONVICTIONS OF THE APPELLANT, TO HIS EXTREME PREJUDICE.

¶101. Conley insists that it was error for the trial court to allow "Conley's previous misdemeanor convictions while in the Army." The record reflects, however, that these convictions were, in fact, general court-martial convictions for robbery and aggravated assault.

¶102. "In the sentencing phase of a capital murder trial, the State is limited to offering evidence that is relevant to one of the aggravating circumstances included in § 99-19-101." *Stringer v. State*, 500 So.2d at 941. Felony convictions involving the use or threat of violence are admissible. Miss. Code Ann. § 99-19-101(5)(b) (Supp.1998). *Edwards v. State*, 737 So. 2d 275, 290 (Miss. 1999).

¶103. "[F]undamental fairness requires that any defendant should not be subjected to testimony and tactics which are highly inflammatory and prejudicial. . . ." *McDonald v. State*, 285 So.2d at 180. Conley's court-martial convictions reveal the use of violence and are admissible under § 99-19-101. We do not find these convictions to be highly inflammatory or prejudicial. *See Walker v. State*, 740 So. 2d 873 (Miss. 1999); *Kelly v. State*, 735 So. 2d 1071 (Miss. Ct. App. 1999). We, therefore, find this assignment of error to be without merit.

### XXI. THE CIRCUIT JUDGE ERRED IN HIS COLLOQUY WITH THE APPELLANT CONCERNING HIS CHOICE NOT TO TESTIFY AT THE PENALTY PHASE OF HIS TRIAL.

¶104. Conley's contentions concerning this assignment of error are extremely unclear. Therefore, we must, to some extent, assume what his complaints are. First, Conley appears to suggest that the trial judge's conference with him regarding his right to testify was somehow insufficient. Second, he expresses concern about the impact on the jury of an altercation which occurred outside the presence of the jury.

¶105. Upon examining the first point, there is no basis for it in the record and no merit to the argument. In *Culberson v. State*, 412 So. 2d 1184, 1186-87 (Miss. 1982), we held:

> We suggest to the trial judges of the state that, in any case where a defendant does not testify, before the case is submitted to the jury, the defendant should be called before the court out of the presence of the jury, and advised of his right to testify. If the defendant states he does not wish to testify, he may not be forced to take the stand; however, if he states that he wants to testify he should be permitted to do so. A record should be made of this so that no question about defendant's waiver of

his right to testify should ever arise in the future.

We noted in *Shelton v. State*, 445 So. 2d 844, 847 (Miss. 1984), however, that the above-quoted excerpt was merely a suggestion that trial judges inquire into whether a defendant desires to testify.

¶106. The record in the case sub judice reveals that the trial judge followed our suggestion. The following occurred during Conley's sentencing trial:

> Court: Mr. Conley, would you stand up, please, sir. At this stage of the proceeding I want to also advise you of your constitutional right to testify or not testify. I realize that your attorney has already rested your case, but I would allow him to reopen it should you desire to testify in this stage of the proceeding. You have a right to testify or not testify and that decision is yours.
>
> Conley: Are you saying, Your Honor, to testify as I would have testified had I elected to do so yesterday?
>
> Court: No, sir. You can testify to anything, basically, the door is wide open for anything you would like to present at this stage of the proceeding. You should confer with your attorney -
>
> Conley: Okay, sir.
>
> Court: - prior to making this decision. But you need to be advised that you have the right to testify, in this stage of the proceeding, just like you did in the last stage of the proceeding. And I want to make sure you understand that. I'm required to inform you of that before the case is concluded and it goes to the jury the second time.
>
> Conley: I understand.

As evidenced by the exchange above, the trial judge went above and beyond his duty to Conley regarding this issue.

¶107. Upon returning to the courtroom after the above-mentioned conference with his attorney, Conley escaped from the jailers and assaulted lead prosecutor William E. Goodwin. The jury was not present during this disturbance. The court regained order, and Conley was handcuffed. Conley's objections to going forward were overruled, and the jury returned to the courtroom. Upon regaining his composure, Conley apologized to the court in the presence of the jury.

¶108. Conley asserts that this disturbance and the resulting consequences are "extraneous influences that came to bear in this trial." The jury's hearing the disturbance, though outside the courtroom, Conley's being handcuffed in the presence of the jury, and the court's charging two people in the courtroom with contempt are events Conley lists as such extraneous influences.

¶109. We have stated:

> The right to a fair trial includes the right to a verdict based on the evidence and not extraneous prejudicial happenings in and around the courtroom. In numerous contexts this Court has held that a verdict based on anything other than the evidence of the crime is tainted, and where it is the result of bias, passion or prejudice it cannot be allowed to stand.

*Fuselier v. State*, 468 So. 2d 45, 53 (Miss. 1985). The jury in the case at bar was ultimately unable to agree on a sentence; thus, the trial judge set the sentence at life without parole. Consequently, any arguments as to the jury's being extraneously influenced are without merit. We, thus, find this entire assignment of error to be without merit.

## SENTENCING INSTRUCTIONS[(4)]

¶110. Again the State asserts that these claims are barred by Conley's failure to raise them before the trial court. Conley assigned these points of error in his motion for new trial, but that assignment was too late according to our holding in *Barnett v. State*, 725 So. 2d at 801. In that case we stated, "While certain issues are required to be raised in a motion for new trial, raising objections there which should have been made at trial has never been thought to cure the failure to object at the proper time." *Id.* We held, "Objections to jury instructions made after the jury has returned a verdict and been discharged is simply too late." *Id.* (citing *Pinkney v. State*, 538 So. 2d 329, 346 (Miss. 1988), *vacated on other grounds*, 494 U.S. 1075, 110 S. Ct. 1800, 108 L. Ed.2d 931 (1990) (noting that issue raised for first time in motion for new trial was procedurally barred); *Anderson v. Jaeger*, 317 So. 2d 902, 907 (Miss. 1975) (holding same). Nevertheless, because of the significance of some of the issues raised by these assignments of error, we choose to address them below as if the proper objections had been made.

¶111. With regard to sentencing instructions, Conley assigns three points of error. First, he argues that Instructions SS-1 and SS-2, regarding the weighing of aggravating and mitigating circumstances, are in conflict with each other. Second, he asserts that the court's denial of Instruction DS-13 and its modification of DS-12 wrongfully eliminated the jury's consideration of a life sentence with the possibility of parole. Third, he contends that these errors in instruction resulted in an ex post facto sentence.

¶112. Miss. Code Ann. § 99-19-101(3) (2000) provides that, in order for a jury to impose a death sentence, it must unanimously find in writing: (1) that the defendant actually killed, attempted to kill, or intended that a killing take place; (2) that the capital offense was committed during the commission of another enumerated felony; and (3) that there are insufficient mitigating circumstances to outweigh the aggravating circumstances.

¶113. Instruction SS-1 states the following:

> The Court instructs the Jury that it must be emphasized that the procedure you must follow is not a mere counting process of a certain number of aggravating circumstances versus the number of mitigating circumstances. Rather, you must apply your reasoned judgment as to whether this situation calls for life imprisonment or whether it requires the imposition of death, in light of the totality of the circumstances present.

Instruction SS-2 tailors § 99-19-101 to fit the facts of this case. It instructs the jury that to return the death penalty the jury "must first unanimously find from the evidence, beyond a reasonable doubt, that the defendant actually killed Whitney Berry." The instruction then explains that the mitigating circumstances must not outweigh the aggravating circumstances. It then lists three aggravating circumstances and instructs the jury that if they find one or more of these beyond a reasonable doubt, they may move on to the next step-mitigating circumstances. At this point the instruction states:

> If you find from the evidence that one or more of the preceding elements of mitigation exists, then you

must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh(s) or overcome(s) the aggravating circumstance(s), you shall not impose the sentence of death.

¶114. We find that any issue as to a conflict between these two instructions is rendered meritless by the fact that Conley did not receive the death penalty. This fact notwithstanding, the State argues, and we agree, that these instructions are a correct statement of the law and are not conflicting. Therefore, this assignment of error is without merit.

### Ex Post Facto Considerations

¶115. The alleged crime for which Conley was convicted occurred on May 22, 1994. At this time two sentencing options were available under Miss. Code Ann. § 97-3-21: death or life in prison. That provision was amended in July, 1994, to allow the option of life in prison without parole.

¶116. Instructions DS-12 and DS-13 provide that the jury should consider both life imprisonment with the possibility of parole and life in prison without the possibility of parole. The court denied DS-13 and amended DS-12 to exclude the "life with the possibility of parole" option. Conley asserts that, as a result, the jury was not properly instructed. The State rebuts that it would have been improper for the court to allow an instruction informing the jury of parole options.

¶117. The jury was unable to reach a verdict as to sentence in this case; so the trial court sentenced Conley to life without parole, a punishment that was not permitted under the statute in effect when the crime was committed. Thus, Conley alleges an ex post facto problem with his sentence.

¶118. An ex post facto clause violation may be avoided by charging and sentencing the defendant according to the statute applicable at the time of his offense. *Johnston v. State*, 618 So.2d 90, 94 (Miss.1993); *Porter v. State*, 749 So.2d 250, 260 (Miss. Ct. App. 1999). Such was not accomplished in this case.

¶119. In *Tubwell v. Anderson*, 776 So.2d 654, 660 (Miss. 2000), this Court examined the United States Supreme Court's holdings regarding the ex post facto clause:

> The U.S. Supreme Court has held that the Ex Post Facto clause is "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.' " *California Dep't of Corrections v. Morales*, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (quoting *Collins v. Youngblood*, 497 U.S. 37, 43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990)). The United States Constitution "forbids the application of any new punitive measure to a crime already consummated. . . ." *Lindsey v. Washington*, 301 U.S. 397, 401, 57 S.Ct. 797, 81 L.Ed. 1182 (1937). A statute may violate the Ex Post Facto clause "even if it alters punitive conditions outside the sentence . . . [or where it] substantially alters the consequences attached to a crime already completed, and therefore changes 'the quantum of punishment.'" *Collins*, 497 U.S. at 32-33 (citation omitted) (quoting *Dobbert v. Florida*, 432 U.S. 282, 293-94, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)).

Applying this analysis to the case at bar, one could, at first glance, conclude that Conley's rights have been

violated. Offering his jury the sentencing option of "life without the possibility of parole," which was unavailable at the time his crime was consummated, works to change "the quantum of punishment" against Conley.

¶120. However, we have held that "[statutory] amendments which are ameliorative or procedural do not violate the prohibition against ex post facto laws." *West v. State*, 725 So. 2d 872, 879 (Miss. 1998) (citing *Johnston v. State*, 618 So.2d at 95. Further, we have reasoned that a sentence of life without parole is ameliorative (and thus does not pose an ex post facto problem) in that it provides a punishment less harsh than death. *Barnett v. State*, 725 So. 2d at 801. *See also* *Lockett v. Ohio*, 438 U.S. 586, 598, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

¶121. The State asserts that Conley waived his ex post facto claim. The State contends that this waiver is evidenced in three ways. First, the State asserts that Conley's submission of Instructions DS-12 and DS-13, which contained the life-without-parole option, shows that Conley wanted the jury to consider this option. Second, the State points out that in closing arguments the trial defense counsel stated, "And I ask you to spare Glen Conley's life. [Do not] sentence him to death-sentence him to life without parole or probation. Do not sentence him to death." Third, during sentencing deliberations, the jury submitted a note to the trial judge asking: "Does it mean when the jury can't agree, will Glen Conley get life in prison, with the chance of parole, or without?" The question was read aloud. The trial judge then asked if there would be an objection to his answering: "life without parole." The State accurately notes that no objection was made.

¶122. In *Barnett*, 725 So. 2d at 801, we found that a defendant had waived his ex post facto sentencing claim by failing to object at trial. Barnett, like Conley, was sentenced to life without parole even though that punishment was not permitted under the statute in effect at the time his crime was committed. We found that Barnett was aware that the sentencing option of life without parole would be given to the jury and that he relied upon the option to escape the harsher penalty of death. This Court stated, "We refuse to allow Barnett to now claim that a life without parole sentence violates ex post facto laws." *Id.* Although Barnett, again like Conley, had raised the ex post facto violation in his motion for new trial, we held "that even then it was not timely-given that the verdict had already been returned." *Id.*

¶123. Based on our holdings in *West* and *Barnett*, we find Conley's ex post facto claims to be without merit.

### XXIV. THE CIRCUIT JUDGE ERRED IN NOT ORDERING A PRE-SENTENCE REPORT PRIOR TO SENTENCING.

¶124. Conley acknowledges that a pre-sentence report is an issue of judicial discretion. He, nevertheless, urges that error occurred in the trial judge's failure to exercise his option to obtain such a report. The State argues that a pre-sentence report would have been a waste of time because a life sentence was statutorily mandated. The State also asserts that, by the end of the trial, the judge had ample knowledge of Conley's background.

¶125. Rule 11.02 of the Uniform Circuit and County Court Rules and Miss. Code Ann. § 47-7-9(3)(a) (2000) provide for pre-sentence investigations and reports. "The rule and the statute clearly establish that the use of pre-sentence investigations and reports is discretionary with the trial judge and is not mandatory. A defendant does not have a right to a pre-sentence investigation." *Hart v. State*, 639 So. 2d 1313, 1320 (Miss. 1994) (citing *Roberson v. State*, 595 So.2d 1310, 1315 (Miss.1992)).

¶126. As the trial judge was considering when to sentence Conley, he asked the defense if it had any objection to going forward with sentencing on that date. Defense counsel replied, "No, sir." In *Taylor v. State*, 741 So. 2d 960, 964 (Miss. Ct. App. 1999), the trial judge gave the defendant the choice either to delay for a pre-sentence report or to proceed with the sentencing. The defendant chose to proceed. *Id.* He, nevertheless, assigned as error on appeal the trial judge's failure to grant a pre-sentence investigation. *Id.* It was held that the judge was not in error for failing to grant that which the defendant had originally turned down. *Id.*

¶127. Conley should have objected to the court's continuing with sentencing if he desired to offer a pre-sentence report. The record reveals that the judge would have allowed more time. In fact, the judge's initial suggestion was to postpone sentencing until the following week.

¶128. The trial judge had complete discretion on this point. Even so, he appears to have been more than accommodating. It can hardly be said that he abused his discretion. We find no merit to this assignment of error.

### XXV. THE CIRCUIT COURT ERRED IN NOT MAKING AN EXAMINATION OF THE APPELLANT'S ABILITY TO PAY THE FINE AND OTHER COSTS ASSESSED AT SENTENCING.

¶129. Conley's sentencing order requires him to pay a $10,000 fine, court-appointed attorney fees, and court costs. Conley complains that the court imposed this financial penalty without an examination of his ability to pay these costs. He asserts that the issue is one of due process. The State asserts that the court did not abuse its discretion in imposing these penalties. Further, the State contends that Conley's constitutional argument on this point is premature under the "ripeness doctrine."

¶130. Miss. Code Ann. § 99-19-32(1)(2000) states:

> Offenses punishable by imprisonment in the State Penitentiary for more than one (1) year and for which no fine is provided elsewhere by statute may be punishable by a fine not in excess of Ten Thousand Dollars ($10,000.00). Such fine, if imposed, may be in addition to imprisonment or any other punishment or penalty authorized by law.

The trial judge has acted within these statutory guidelines with his imposition of the penalties in this case. It is within the trial judge's discretion to impose these fines. Absent a showing that this discretion was abused, the fines must be upheld by this Court. *See Wallace v. State*, 607 So. 2d 1184, 1187 (Miss. 1992). Conley has not shown that the judge abused his discretion.

¶131. Conley implies that it was the judge's responsibility to inquire into Conley's ability to pay the costs assessed but cites no authority for this proposition. The statutory guidelines suggest that Conley should have taken the initiative on this point. Miss. Code Ann. § 99-19-20(2)(2000) states in part:

> The defendant shall not be imprisoned if the defendant is financially unable to pay a fine and so states to the court in writing, under oath, after sentence is pronounced, and the court so finds, except if the defendant is financially unable to pay a fine and such defendant failed or refused to comply with a prior sentence as specified in subsection (1) of this section, the defendant may be imprisoned.

The record reveals that Conley did inquire into this matter after the judge imposed the penalties.

Conley: The only question, Your Honor. I'd love to pay these attorneys, but how am I going to do it from incarceration?

Court: Well, I understand. But that's part of the sentence of the Court.

This question, however, does not amount to petitioning the court for a financial inquiry. While Conley did raise the issue, he did not submit the requisite written oath and failed to adequately reveal his inability to pay the costs assessed.

¶132. Furthermore, we agree with the State that Conley's constitutional arguments are not ripe for review. These issues should be raised when and if the State actually attempts to collect these penalties and to deprive Conley of his freedom for not paying them. "It is an indisputable and invariable rule of law that a right of action must be complete when an action therefor is commenced." *Miller v. Fowler*, 200 Miss. 776, 782, 28 So. 2d 837, 839 (1947). Conley has been imprisoned for capital murder, not for failure to pay his fines. Until such is the case, we find this argument to be without merit.

## XXVII. THE SENTENCE IMPOSED BY THE CIRCUIT COURT IS UNDULY HARSH AND VINDICTIVE AND CONSTITUTES A VIOLATION OF THE APPELLANT'S EIGHTH AMENDMENT RIGHTS.

¶133. Conley raises this issue but then completely fails to develop the argument. In his assignment of error he states that the sentence is unduly harsh and violates his Eighth Amendment rights. This constitutional claim is never addressed beyond this point. Instead, he reverts to arguments regarding the insufficiency of the evidence, the improper admission of certain evidence, and other arguments which have already been addressed.

¶134. Furthermore, Conley fails to cite any authority supporting his assignment of error or to direct this Court to portions of the record supporting his claim. We have long held that an argument unsupported by cited authority need not be considered by the Court. *See, e.g.*, *Hankins v. Hankins*, 729 So. 2d 1283, 1286 (Miss. 1999); *Drennan v. State*, 695 So. 2d 581, 585-86 (Miss. 1997); *Grey v. Grey*, 638 So. 2d 488, 491 (Miss. 1994).

¶135. It has long been settled that a life sentence for capital murder is not unduly cruel, unusual, or harsh. *Kennedy v. State*, 732 So. 2d 184, 187 (Miss. 1999); *Burrell v. State*, 726 So. 2d 160 (Miss. 1998); *Herring v. State*, 691 So. 2d 948 (Miss. 1997). Therefore, we find this assignment of error to be without merit.

## XXVIII. WHETHER THE DENIAL OF THE APPELLANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR A NEW TRIAL IS CONTRARY TO LAW AND AGAINST THE OVERWHELMING WEIGHT OF THE CREDIBLE EVIDENCE IN THIS TRIAL.

¶136. Conley asserts that the jury's verdict is against the overwhelming weight of the evidence and that, accordingly, a new trial should be ordered. Conley's burden of persuasion on this issue is extremely high. "We have literally hundreds of decisions considering the circumstances under which we will vacate a jury's verdict in a criminal case and remand for a new trial." *Groseclose v. State*, 440 So.2d 297, 300 (Miss. 1983). Considering the discretionary role of the circuit judge, this Court will not reverse on the denial of a

new trial motion unless it is convinced the verdict is so contrary to the weight of the credible evidence that to allow the verdict to stand would sanction an unconscionable injustice. ***Johnson v. State***, 642 So.2d 924 (Miss. 1994); ***McCain v. State***, 625 So.2d 774 (Miss. 1993). "Any less stringent rule would denigrate the constitutional power and responsibility of the jury in our criminal justice system." ***Groseclose***, 440 So.2d at 300.

¶137. Conley asserts two major prongs in support of his argument. First, he asserts that there is a lack of credible evidence supporting his guilty verdict. Conley relies heavily on the inconsistent testimony of Teronda Berry to support this proposition. Teronda changed her testimony numerous times at trial before eventually incriminating herself and Conley and asserting her Fifth Amendment rights.

¶138. When this Court analyzes a jury's verdict to determine whether it goes against the overwhelming weight of the evidence, we must keep in mind that the jury is the ultimate finder of fact. We do not have the task of re-weighing the facts in each case and going behind the verdict of the jury to detect whether the testimony and evidence they chose to believe was or was not the most credible. In ***Gandy v. State***, 373 So.2d 1042, 1045 (Miss. 1979), this Court explained the role and function of the jury in criminal cases as follows:

> Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into finding of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolutions.

Also, in ***Bond v. State***, 249 Miss. 352, 257, 162 So.2d 510, 511 (1964), this Court stated that "[i]n a criminal prosecution, the jury may accept the testimony of some witnesses and reject that of others, and may accept in part and reject in part the testimony of any witnesses, or may believe part of the evidence on behalf of the state and part of that for the accused, and the credibility of such witnesses is not for the reviewing court, but only for the jury."

¶139. We find that the jury in the case sub judice heard all of the evidence, weighed the credibility of each witness, and chose whom to believe in its finding Conley guilty of capital murder. We will not go behind the jury's verdict and re-weigh the facts or the credibility of each witness. We find that the verdict is not so contrary to the overwhelming weight of the evidence as to constitute an unconscionable injustice.

¶140. Second, Conley asserts that there were numerous procedural and statutory errors in the course and conduct of the trial. Conley bases this proposition on his previous arguments regarding jury instructions and his sentencing. As these arguments have previously been addressed and found to be without merit, they will not be revisited here.

## XXIX. WHETHER THE CUMULATION OF ERROR IN THE PENALTY PHASE AND THE POST-TRIAL PHASE OF THIS CASE REQUIRES A NEW TRIAL.

¶141. Conley argues on appeal that the cumulation of errors in the penalty phase and the post-trial phase, if

not taken as error sufficient to reverse and remand for a new trial individually, are sufficient to reverse and remand if taken as a whole. "This Court has often ruled that errors in the lower court that do not require reversal standing alone may nonetheless taken cumulatively require reversal." *Jenkins v. State*, 607 So.2d 1171, 1183 (Miss.1992). However, "where there was no reversible error in any part, so there is no reversible error to the whole." *Coleman v. State*, 697 So.2d 777, 787 (Miss.1997).

¶142. In the post-trial phase, the State acknowledged that Conley was entitled to a new sentencing trial based upon the ex post facto error. However, the State has since changed its opinion to accurately reflect the current law on this issue. The ex post facto argument has been fully addressed in the argument labeled "Sentencing Instructions," where this Court found no reversible error.

¶143. "The question under the cumulative error rule is whether the defendant has been denied his substantial right to a fair trial." *Wiley v State*, 750 So.2d 1193, 1210 (Miss. 1999). "There never has been a perfect trial. As long as humans conduct and participate in trial of lawsuits, there will not be such a trial. This Court has said many times that a defendant is not entitled to a perfect trial, only to a fair trial." *Walker v. State*, 671 So.2d 581, 629-30 (Miss.1995).

¶144. Each of Conley's complaints combined cumulatively was not such as to deny him a fundamentally fair trial. This is not one of those rare cases requiring reversal on the ground that cumulative effect of all errors deprived the defendant of a fair trial. Accordingly, we find no merit to this issue.

## <u>CONCLUSION</u>

¶145. This Court finds that Conley's assignments of error are either procedurally barred or without merit. For the foregoing reasons, we affirm.

¶146. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT BENEFIT OF PAROLE, PROBATION OR EARLY WORK RELEASE, AND PAYMEMT OF A FINE IN THE AMOUNT OF $10,000, COURT APPOINTED ATTORNEYS FEES AND COURT COSTS, AFFIRMED.**

> **PITTMAN, C.J., SMITH, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR. BANKS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY McRAE, P.J. McRAE, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

BANKS, PRESIDING JUSTICE, DISSENTING:

¶147. I respectfully dissent. In my view this case must be reversed and remanded for a new trial because the trial court failed to instruct the jury properly with regard to the elements of kidnapping contrary to this Court's decisions in *Hunter v. State*, 684 So. 2d 625 (Miss. 1996) and *Ballenger v. State*, 761 So. 2d 214 (Miss. 2000).

¶148. It is also my view that the majority succumbs to serious misdirection from a previous statement by this Court and finds conflict in our authority where there is none. There is no real conflict in our law of kidnapping other than the misstatement in *Williams I*, *Williams v. State*, 544 So. 2d 782, 790 (Miss. 1987), quoted in *Williams II, Williams v. State,* 684 So.2d 1179, 1188 (Miss. 1996). Contrary to that

misstatement, our kidnapping statute is and has always been a specific intent statute. Moreover, there is no conflict in our prior holdings, as I shall endeavor to demonstrate.

I.

¶149. Our kidnapping statute requires, in pertinent part, proof that the accused "forcibly seize and confine" or "inveigle or kidnap" a person "with the intent to cause such person to be secretly confined or imprisoned against his or her will." Miss. Code Ann. § 97-3-53 (2000). *Williams v. State*, 544 So. 2d 782, 790 (Miss. 1987) made the troublesome and confusing statement that "*kidnapping is not a specific intent crime*, it is sufficient that the circumstances resulted in such a manner as to effect a kidnapping as opposed to an actual intent to kidnap, *i.e., it is not ne cessary to establish the mental state of intent by direct evidence."* (emphasis supplied). What should be clear is that the two italicized statements are simply not the same thing. Proof of intent by other than direct evidence is the norm. That fact does not mean that no intent need be proven, which is the import of the statement that kidnapping is not a specific intent crime. What *Williams* actually held was that based on the evidence there presented "a reasonable juror could have found that [the victim] was inveigled, *i.e.*, enticed or tricked, with intent to secretly confine her against her will." *Id.* at 790. In other words, intent to secretly confine or imprison was proven.

¶150. What should also be clear is the statute states the intent necessary to the commission of the crime. *Williams I* should not be viewed as re-writing the statute. The cases which it cites for the quote above, *Williams v. State*, 445 So. 2d 798, 809 (Miss. 1984) and *Voyles v. State*, 362 So. 2d 1236 (Miss. 1978), say no more than that intent need not be established by direct evidence. Our precedents, before and after *Williams*, make it clear that the intent required in the statute must be shown. *See, e. g.*, *Chevalier v. State*, 730 So. 2d 1111, 1115 (Miss. 1998); *Hughes v. State*, 401 So. 2d 1100, 1105 (Miss. 1981).

¶151. The majority suggests that we have competing lines of authority on the issue of whether an intent to secretly confine or imprison need be shown. I disagree.

¶152. In *Chevalier* this Court correctly observed that this Court cannot read words out of the statute. 730 So. 2d at 1115. Criminal statutes are strictly construed. *Id*. It requires no strict construction to observe that the words "with the intent to secretly confine or imprison" may not be construed to require no such intent. In *Aikerson v. State*, 274 So. 2d 124, 125 (Miss. 1973), the indictment failed to set out any intent at all. It simply stated that the defendant seized and confined a person against her will. *Id.* This obviously does not comport with the statute.

¶153. The majority identifies *Buckley v. State*, 223 So. 2d 524 (Miss. 1969) as another line of authority. That case does not stand for the proposition that no intent be shown. *Buckley* involved a former version of our kidnapping statute which prescribed as alternative elements of intent, in addition to the objective of secretly confining or imprisoning, to "cause such person to be sent out of this state against his will, *or to cause such other person to be deprived of his liberty."* (emphasis supplied). *Id.* at 527. The indictment charged an intent to deprive the victim of his liberty, a proper charge under the statute as it existed at that time. *Id.*

¶154. Our holding in *Wilcher v. State*, 448 So. 2d 927 (Miss. 1984), is not a contrary line of authority. What we held in *Wilcher* was the evidence of intent to "secretly confine or imprison" was sufficient to create a jury issue. *Id.* at 935. That evidence was that Wilcher tricked the victims into going to a deserted location where he could rob them. *Id.*

¶155. In short, there is only one line of authority. In each instance cited this Court has required an allegation and proof of a specific intent in accordance with the statute. Therefore, the majority's attempt to write words out of the statute is erroneous.

## II.

¶156. Turning to the merits of Conley's claim, we can see immediately that his suggestion that the verdict finding a kidnapping was against the overwhelming weight of the evidence and his contention that it was inconsistent with the dismissal of the charges against Teronda have no merit. The evidence is clearly sufficient to support a view that Conley inveigled the child into an area of the lake removed from other persons with an intent to confine her there for the purpose of killing her. *See Wilcher,* 448 So. 2d at 935. The fact that the charges against Teronda were dropped is of no moment. First, Teronda may have been a co-conspirator. As such, she would not have been kidnapped. Next, there is no inconsistent verdict here. The case with respect to Teronda never went to the jury. The prosecutor is not required to charge all crimes committed by a defendant. Finally, even if it had gone to the jury, where the evidence is sufficient to sustain a conviction, the defendant cannot complain about the failure of the jury to convict with respect to some other crime. *See Hollman v. State,* 656 So. 2d 1134, 1142-43 (Miss. 1995) (court's review of sufficiency of evidence is adequate protection from jury error or irrationality in rendering inconsistent verdicts).

## III.

¶157. The final issues concern jury instructions. The overriding issue here is the failure of the court to given any instruction setting forth the elements of kidnapping. Under both *Hunter*, 684 So.2d at 625, and *Ballenger II,* 761 So. 2d at 214, that is reversible error, even if there was no objection.

¶158. Instruction S-1 defines kidnapping as "the seizure and confinement of a person without lawful authority either by force or by trickery." Instruction C-4 defines "inveigle" as "to trick or deceive" to no apparent purpose because the word is not used elsewhere in the instructions except in the defense instructions which were refused. This is so even though the State's theory was that Conley inveigled the child into confinement. Most importantly, nowhere does the court instruct that the seizure and confinement or inveiglement must be with "the intent to cause such person to be secretly confined or imprisoned against his or her will" as the crime is defined by the statute. This is fatal error. "It is rudimentary that the jury must be instructed regarding the elements of the crime with which the defendant is charged. Therefore, even though the defendant did not present an acceptable instruction , the State was obligated to do so." *Hunter*, 684 So. 2d at 636.

¶159. Here the defendant offered instructions which stated the required intent. The State suggests a procedural bar as to these defense instructions based upon the failure to object to their refusal. No such objection is required. *Finley v. State*, 725 So.2d 226, 230-31 (Miss. 1998); *see also Duplantis v. State*, 708 So.2d 1327, 1339-40 (Miss. 1998) (the issue of improper denial is preserved by tendering the instructions and asking that they be given). There is no procedural bar here.

¶160. On the merits of the defense instructions, however, it is clear that they are faulty. They present a theory of kidnapping that the State was not attempting to prove, that the kidnapping was against the will of the parent, Teronda. I agree with the State that the charge may be brought alternatively with respect to a person's own consent, without regard to age, or in the case of a child under ten, with respect to the parent's

consent. *See* Miss. Code Ann. § 97-3-53. In my view, the defense instructions were properly refused for that reason.

¶161. Nevertheless, this conviction for capital murder cannot stand in light of *Hunter* and *Ballenger II*. Like those cases the proof here could be deemed sufficient for a properly instructed jury to have found all of the elements. The problem is that the jury was not instructed on the elements and we have found this to be fundamental error in *Hunter* and *Ballenger II,* the latter in post-conviction proceedings. "It is axiomatic that a jury's verdict may not stand upon uncontradicted fact alone. The fact must be found via jury instructions correctly identifying the elements of the offense under the proper standards." *Hunter*, 684 So. 2d at 636 (quoting *Henderson v. State*, 660 So. 2d 220, 222 (Miss. 1995)).

¶162. For these reasons, I respectfully dissent and would reverse and remand for a new trial before a properly instructed jury.

**McRAE, P.J., JOINS THIS OPINION IN PART.**

**McRAE, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶163. I concur with the majority as to the guilt phase of Conley's appeal. However, at the time of the crime in 1994, the Pike County Circuit Court was bound by a statute which allowed only for sentences of life with the possibility of parole or death. Imposing a sentence of life without parole was beyond the sentencing authority of the court, as it allows the State to enhance the sentence ex post facto. I would therefore remand this case for sentencing in accordance with section 97-3-21, as it existed at the time of Whitney's death. I further decline to sanction the use of private entities to conduct police investigations without requiring and having safeguards of constitutional rights. Accordingly, I concur in part and dissent in part with the majority.

¶164. As discussed by the majority, the law in effect at the time of the crime only provided for two possible sentences: death or life in prison with the possibility of parole. Miss. Code Ann. § 97-3-21 (1972). Only a unanimous jury may impose the death penalty. Because the jury could not reach a verdict, it was incumbent on the court to impose a sentence. After the sentencing trial, the court sentenced Conley to life imprisonment without the possibility of parole, which was a sentence that was not authorized by the statute in effect at the time Conley's committed the crime.

¶165. We have refused to apply a statutory amendment retroactively where the new law required that 85% of sentence be served, as opposed to 25% prior to the amendment, before the defendant may become eligible for parole. *See* *Puckett v. Abels*, 684 So.2d 671 (Miss. 1996). We also declared the amendment to be an ex post facto law as applied to a defendant who was charged with committing a crime before the effective date of the amendment and whose charge was not to be disposed of until after effective date. *Id.* at 678 (holding that law violated ex post facto prohibition because it was applied retroactively, and had the effect of increasing the punishment beyond that proscribed when the crime was committed). *See also* *McKnight v. State*, 751 So.2d 471, 474-75 (Miss. 1999).

> Critical to relief under the Ex post facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and

more onerous than the law in effect on the date of the offense.

*Puckett,* 684 So.2d at 674 (citing *Weaver v. Graham*, 450 U.S. 24, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981)). When a trial court exceeds its sentencing authority, it is incumbent upon the appellate courts to vacate the sentence and remand for sentencing in accordance with the law. *Burton v. United States*, 237 F.3d 490 (5th Cir. 2000) (vacating life sentence because it exceeded the maximum statutory penalty).

¶166. The majority primarily relies on *Barnett v. State*, 725 So.2d 797, 801 (Miss. 1998) for the proposition that "a sentence of life without parole is ameliorative (and this does not pose an ex post facto problem) in that it provides a punishment less harsh than death." Barnett was sentenced by a jury to life without parole, which was a sentence that was not authorized by the statute in effect at the time of his conviction. In that case, we found that the jury's verdict was ameliorative because he could have been sentenced to death, and that "he relied upon the option he now complains of to escape the harsher penalty of death." *Id.*

¶167. Unlike Barnett, Conley was not facing a possible death penalty at the time he was sentenced. Only a unanimous jury can return a verdict of death, which it was unable to do in Conley's case. It then became the responsibility of the court to impose a sentence. We therefore cannot assume that the court's sentence of life without the possibility of parole was ameliorative. At the time of sentencing, Conley was no longer facing the death penalty. The circuit court exceeded its sentencing authority by imposing a sentence that was not provided for in the statute in effect at the time the crime was committed. The majority recognizes and even quotes from *Tubwell v. Anderson*, 776 So.2d 654 (Miss. 2000). I, therefore, respectfully dissent and would reverse for proper sentencing.

¶168. Furthermore, I write to express my concern with the practice of law enforcement officials using insurance investigators or other private citizens to help conduct investigations. Law enforcement officials are bound by many laws which protect the rights of the public from State action. Many of these same rights are not protected from actions by private interests, which may serve to erode our civil liberties if private interests are allowed to conduct investigations for or under the State.

> It is well settled that **if a private party wrongfully conducts a search or seizure of another's person or property the Fourth Amendment is not violated and that such private misconduct does not deprive the Government of the right to use evidence that it has obtained legally**.

*Walter v. United States*, 447 U.S. 649, 656, 100 S. Ct. 2395, 96 L. Ed. 2d 410 (1980) (emphasis added).

¶169. In Mississippi, we have recognized the inequity of such a rule. "[I]f a governmental agent is incompetent to testify to the fruits of an illegal search, then so is a disinterested, private bystander who observed the search." *Rose v. State*, 586 So.2d 746, 755 (Miss 1991).

¶170. As noted by the majority, civilian participation in such organizations as "Crimestoppers" has "helped to put thousands of criminals behind bars." However, private citizens offering tips is one thing. Endorsing civilian participation in conducting active police investigations is quite another. Such a practice could lead to the questioning of suspects by private interests without informing them of their constitutional rights.

¶171. For example, if State Farm took statements from Conley at the behest of or in acquiescence with law enforcement officials, then Conley must be informed of his constitutional rights to prevent subversion of

them. "The question is whether, in view of the circumstances of the case, the private party acted as an instrument or agent of the Government when he conducted the search." *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971).

¶172. The majority of this investigation appears to have been conducted by State Farm employees Ralf Limbaugh and Ruth Granning. After Conley was convicted, the prosecutor was quoted in a newspaper article as stating that Ruth Granning was instrumental to the success of the investigation, and that it would not have been possible without the records of her initial interviews with witnesses. Conley refused to talk to police investigators, and, as noted by the majority, "State Farm's help became necessary when Conley refused to give a statement to anyone other than State Farm."

¶173. The trial transcript reveals that Limbaugh and Granning were the first to interview Conley, at a State Farm claim office in Hammond, Louisiana. The court allowed Granning to testify to Conley's statement based on the following reasoning: "The fact that there were no Miranda warnings given is not a custodian to interrogation so it wouldn't apply." In other words, the circuit court held that the interview did not constitute a custodial interrogation, and Conley was therefore not entitled to be informed of his rights prior to making the statement, even though a tape recording of the statement was provided to state investigators.

¶174. I write to point out some of the inherent dangers in adopting a rule which allows private interests to conduct what are essentially police investigations. In the instant case, Conley has not shown that the State Farm investigators were acting as instrumentalities of the State at the time of the interview. As a result, the insurance agents were able to procure a tape recorded interview from Conley without informing him of his constitutional rights, at a time when he was clearly not willing to talk to police investigators.

¶175. Because private citizens and interests are not trained to protect constitutional rights and are not even required by law to observe many of them, their testimony should be closely reviewed so as to insure the rights of individuals are protected. I concur as to Conley's guilt, but would remand this case for re-sentencing, as the circuit court exceeded its statutory sentencing authority in sentencing Conley. Accordingly, I concur in part and dissent in part.

1. Teronda is also the mother of two illegitimate sons, Kenshawnry ("Ken") and Patrick.

2. Conley's Propositions 12, 14, 15, and 16 all deal with the issue of kidnapping and will, thus, be examined together here.

3. Conley had moved for a 12-hour cooling-off period early in the litigation.

4. This discussion combines Conley's Propositions 22, 23, and 26.