935 So.2d 1047 (2005)
Keith David WARD, Appellant
v.
STATE of Mississippi, Appellee.
No. 2003-KA-01415-COA.
Court of Appeals of Mississippi.
December 6, 2005.
Rehearing Denied April 18, 2006.
*1050 Keith David Ward, appellant, pro se.
James (Jay) R. Foster, attorney for appellant.
Office of the Attorney General by Deirdre McCrory, attorney for appellee.
Before KING, C.J., IRVING and BARNES, JJ.
*1048 BARNES, J., for the Court.
¶ 1. Keith David Ward was indicted on the charge of murder and tried by jury in the Circuit Court of Harrison County. The jury found Ward guilty of manslaughter, and he was sentenced to seventeen years in the custody of the Mississippi Department of Corrections. Aggrieved, Ward appeals to this Court. Finding no error, we affirm.

FACTS
¶ 2. Ward lived in a home in Gulfport with Robert Hinton. Hinton owned the home, and Ward paid rent to him in the amount of $300 per month under an informal agreement. Testimony at trial indicated that on June 23, 2001, Ward and Hinton were at the beach drinking beer with other individuals. This was an almost daily event for the two men. One witness testified that, at approximately 2:15 p.m., Hinton told Ward that he must move out of his house by the first of the month. Ward responded by threatening Hinton. Then, at 4:00 p.m., Ward became involved in a dispute with another person on the beach. After this dispute, Ward left the beach, but Hinton remained.
¶ 3. Carmen Fobbs, who lived across the street from Hinton's house, testified that while she was sitting on her porch on the afternoon of June 23, 2001, Ward approached her and offered to sell her some meat from his refrigerator, because he "didn't want [Hinton]" to eat it. She purchased the meat from Ward for $10, *1051 whereupon he returned to Hinton's house. Ward later returned to Fobbs' house, claiming that he had been down to the beach and had an argument with Hinton. Ward again departed, but returned approximately thirty minutes later. Initially, Ward sat down and watched television at Fobbs' house. Then, a child who was under Fobbs' care noticed that Ward's foot was bleeding. Fobbs cleaned the wound with peroxide, whereupon Ward blurted out that he had "killed that son of a bitch." Fobbs testified that she was incredulous, so she walked across the street to Hinton's house. Without entering the house, she peeked through the door and verified that there was a motionless body on the floor. She then returned to her home and informed Ward that Hinton was indeed dead, and that Ward would have to call 911. Ward agreed, but asked that he be allowed to finish his beer and a cigarette before he made the call. Fobbs then called 911.
¶ 4. Officer Eddie Hilliard and Officer Joey McCormick answered the 911 call and investigated the scene. Officer Hilliard testified that he and Officer McCormick spoke with Ward when they first arrived. Ward informed the officers that he had been fighting with "that man." When asked where "that man" was, Ward replied that he was in the house, "dead." The officers then handcuffed Ward, and proceeded to the house, where they discovered the lifeless body of Hinton, covered in blood from head to foot.
¶ 5. Meanwhile, Ward was placed in an ambulance to be taken to the hospital and treated for the injury of his foot. Dorothy Jean Cooley, a neighbor of Fobbs and Ward, testified that she witnessed Ward being lifted into the ambulance. As Ward was being placed in the ambulance, she stated that he turned to her and exclaimed, "I told you I got him."
¶ 6. Dr. Paul McGarry, the pathologist who performed the autopsy of Hinton, testified at trial as an expert for the State. Dr. McGarry explained that when he examined the body of Hinton, it was completely covered with blood. He testified that Hinton had sustained massive head injuries caused by blows from a heavy object. These injuries had caused significant damage to the underlying tissues of Hinton's head, and fragments of bone had been driven downward into his brain. The injuries to Hinton's head included a crushed forehead, broken nose, fractured cheeks, and fractured upper and lower jaw. Dr. McGarry testified that these injuries indicated that the blows had been inflicted repeatedly, that Hinton had not been moving his head when the blows were applied, and that Hinton was therefore in a "relatively defenseless position" while he was being hit. Dr. McGarry also testified that Hinton had "cut wounds and bruises of both hands, elbows, left arm," which McGarry identified as defensive wounds. Finally, Dr. McGarry noted that Hinton had two stab wounds to his neck, one cutting the jugular vein, and one cutting the trachea.
¶ 7. Ward testified in his own defense. He stated that, on June 23, 2001, he had walked down to the beach at approximately 12:00 p.m., and that he saw Hinton there. Ward claims that he and Hinton became involved in a dispute over Ward's behavior toward a woman who had walked by. As a result of the dispute, Ward returned to the house at approximately 3:00 p.m., while Hinton remained at the beach. Ward testified that he and Hinton had not been speaking "for the last few days and now what had happened down at the beach it looked like things were starting to escalate ...." Ward stated that he sold the remaining meat in his refrigerator to Fobbs; however, he claims that he did *1052 so because he expected Hinton to force him to move out the next day, not because he wanted to prevent Hinton from eating the meat.
¶ 8. Ward explained that he was sitting at the breakfast bar at the house when Hinton returned in the evening. He recalled that Hinton walked into the house and demanded that Ward vacate the premises immediately. After an argument, Hinton initially seemed to let the issue drop, but then turned and "sucker-punched" Ward. Ward and Hinton immediately began wrestling and "clutching," until they crashed through a table. Ward testified that at this point he was able to get "a tag in on [Hinton]." Hinton then turned and headed for the kitchen, telling Ward "I'm going to cut your throat." Ward stated that he knew there was a knife in the kitchen, so to prevent Hinton from reaching the knife, he took a piece of wood from the broken table and hit Hinton over the head. Ward admitted that he repeatedly struck Hinton in the head with the wooden board,[1] but claimed that he did so because he feared that Hinton would get back to his feet, take the knife, and kill Ward. Ward then took the knife that Hinton had purportedly been attempting to reach and stabbed Hinton in the neck in two quick motions. Ward testified that the beating and stabbing of Hinton was necessary because if he allowed Hinton "to get the upper hand," then Ward would be "dead meat."
¶ 9. Ward was indicted for the murder of Hinton. Trial was held in the Circuit Court of Harrison County on April 29 and 30, 2003. Ward argued at trial that his actions were justified as self-defense. The jury found, however, that he was guilty of manslaughter. On appeal, Ward argues through counsel that the trial court erred in allowing the expert testimony of Dr. McGarry because the State provided incomplete discovery, that the trial court should have allowed Fobbs to testify to a statement made by Ward to Fobbs, that the trial court improperly denied a motion for a directed verdict, and that the trial court erred in granting a manslaughter instruction. In addition, Ward argues in a brief he submits pro se that his trial counsel was constitutionally ineffective. For these reasons, Ward states that he is entitled to a new trial.

I. WHETHER THE STATE VIOLATED THE RULES OF DISCOVERY AND THEREFORE THE TRIAL COURT ERRED BY DESIGNATING DR. PAUL MCGARRY AS AN EXPERT WITNESS
¶ 10. Ward argues that the State violated Rule 9.04 of the Uniform Rules of Circuit and County Court Practice by failing to disclose the basis and substance of Dr. McGarry's opinion prior to trial. Particularly, Ward complains that he was not aware prior to trial that Dr. McGarry would testify to defensive wounds found on Hinton's body. Ward claims that he was only provided the autopsy report prior to trial, and that McGarry testified outside the scope of this report. Thus, Ward argues, much of McGarry's testimony was *1053 heard by the defense for the first time at trial. The State counters that any information regarding Dr. McGarry's testimony was provided to defense counsel orally prior to trial, and that defense counsel was well aware of the testimony which was offered by Dr. McGarry by the time trial commenced. We find that no discovery violation justifying a new trial has occurred.
¶ 11. Rule 9.04 of the Uniform Rules of Circuit and County Court Practice holds, in relevant part:
A. Subject to the exceptions of subsection "B", below, the prosecution must disclose to each defendant or to defendant's attorney, and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request and without the necessity of court order the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution:
. . .
4. Any reports, statements, or opinions of experts, written, recorded or otherwise preserved, made in connection with the particular case and the substance of any oral statement made by any such expert. . . .
¶ 12. "This Court is limited in reversing a trial court's actions regarding discovery issues. We may reverse a trial judge's ruling regarding discovery issues only if we find an abuse of discretion." Moore v. State, 822 So.2d 1100, 1107 (¶ 19) (Miss.Ct.App.2002) (citing Conley v. State, 790 So.2d 773, 782 (¶ 20) (Miss.2001)).
¶ 13. It is clear that the trial judge did not abuse his discretion in finding that there had been no discovery violation in the instant case. Although Ward claims that he was not provided with sufficient information regarding Dr. McGarry's testimony to "properly prepare for cross-examination... hire experts ... [or] properly prepare for trial," we find from the record that Ward's counsel at trial was well aware of the testimony which Dr. McGarry proposed to offer. The following colloquy occurred between the trial judge and Ward's counsel:
BY THE COURT: . . . Do you agree that [defense counsel] ha[s] had extensive conversations about what Dr. McGarry's testimony is going to be concerning whether behavior or actions were consistent with self-defense based on the autopsy?
BY MR. RAFFERTY: Absolutely, Judge. Since the beginningjust wanted to get his basis of his opinion, substance of his opinion.
BY THE COURT: And you've got that. It's not in writing but you've got that?
BY MR. RAFFERTY: Yes, sir, Judge. We have spoken to them.
¶ 14. The record also indicates that defense counsel had received a letter from the State prior to trial which stated that Dr. McGarry would testify to the existence of defensive wounds on Hinton's body, and that defense counsel had interviewed Dr. McGarry on at least two separate occasions, once prior to trial and once on the morning of the trial. This being the case, even if the information provided by the State was somehow inadequate, defense counsel had two different opportunities to question Dr. McGarry as to the full extent of his proposed testimony at trial. And, as the above colloquy between the trial judge and defense counsel indicates, defense counsel did exactly this, and was well aware of Dr. McGarry's proposed testimony.
¶ 15. In Moore, this Court found that there had been no discovery violation when the defense was apprised of expert testimony *1054 by a phone call and then later a faxed report. Moore, 822 So.2d at 1107. The Court noted that the defendant had ample opportunity to secure his own expert witness, but that he failed to do so. Id. Similarly, we can find no prejudice here where the defense was made aware of the substance of Dr. McGarry's opinion prior to trial, even if the disclosure was oral. This issue is without merit.

II. WHETHER THE TRIAL COURT ERRED BY REFUSING TO ADMIT A HEARSAY STATEMENT MADE BY THE DEFENDANT
¶ 16. Ward argues that his counsel at trial should have been allowed to question Fobbs as to a statement made by Ward to Fobbs regarding a statement made by Hinton to Ward. Specifically, Ward claims that Hinton had threatened to kill Ward, and that Ward had told Fobbs about this threat made on his life. This statement, according to Ward, should be allowed under Rule 803(3) of the Mississippi Rules of Evidence, which contains a hearsay exception for "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition . . . but not including a statement of memory or belief to prove the fact remembered or believed...." The State urges that the statement is self-serving, and therefore was properly excluded as hearsay.
¶ 17. Our standard of review on questions of the admission of evidence by the trial court is an abuse of discretion standard. Adams v. State, 851 So.2d 366, 374 (¶ 21) (Miss.Ct.App.2002) (citing Clemons v. State, 732 So.2d 883, 887-88 (¶ 18) (Miss.1999)). There is no question that the statement involved herein is hearsay, and it is furthermore double hearsay, which implicates Rule 805 of the Mississippi Rules of Evidence. Rule 805 provides that "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Thus, "[e]ach hearsay part must qualify under an exception to be admissible." Rule 805 cmt.
¶ 18. Breaking this proposed testimony into two parts, we find that the first alleged statement is a statement by Hinton to Ward that Hinton intended to kill Ward. Clearly this is inadmissable hearsay, because it is being offered for the direct purpose of proving that Hinton had threatened Ward. This is exactly the type of statement intended to be excluded by Rule 803(3), that is, "a statement of memory or belief to prove the fact remembered." Since the statement purportedly made by Hinton to Ward must be excluded, any statement made by Ward to Fobbs regarding that statement must be excluded as well. Furthermore, we agree with the State that "the defendant is barred from introducing a statement made by the defendant immediately after the crime, if it is self-serving, and if the State refuses to use any of it." Nicholson ex rel. Gollott v. State, 672 So.2d 744, 754 (Miss.1996). Accord Tigner v. State, 478 So.2d 293, 296 (Miss.1985); Jones v. State, 342 So.2d 735, 736-37 (Miss.1977). Any statement made by Ward to Fobbs regarding threats made by Hinton to Ward would serve Ward's argument at trial that his actions were justified in self-defense. Therefore, the statement is self-serving and was properly excluded by the trial judge.

III. WHETHER THE TRIAL COURT ERRED BY REFUSING TO GRANT A DIRECTED VERDICT
¶ 19. Ward contends that the trial court should have directed a verdict in his favor at the conclusion of trial. He argues *1055 that, under the Weathersby Rule,[2] the only evidence the jury could properly consider was his own testimony, and, implicitly, that the evidence was therefore insufficient to sustain a verdict. The State replies that there is ample admissible evidence supporting the verdict, including the expert testimony of Dr. McGarry. We agree with the State that evidence exists which created a jury question. Furthermore, even assuming arguendo that there was no evidence outside of Ward's testimony, we find that Ward's testimony itself supports the jury verdict of manslaughter.
¶ 20. "[I]n considering whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict . . . the critical inquiry is whether the evidence shows `beyond a reasonable doubt that the accused committed the act charged' . . . ." Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). The trial court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Therefore, we review the evidence in the light most favorable to the prosecution, and determine whether it is sufficient to create a jury question for each element of the crime. Here, Ward was convicted of manslaughter. The elements of manslaughter are laid out in Mississippi Code Annotated section 97-3-35, and include (1) the killing of a human being, (2) without malice, (3) in the heat of passion, (4) but in a cruel or unusual manner, or by the use of a dangerous weapon, (5) without authority of law, (6) and not in necessary self-defense.
¶ 21. It is clear that ample evidence was presented at trial to meet all of the elements of the crime of manslaughter. By Ward's own admission, he killed Hinton during a dispute that involved physical violence. Ward admitted that he had repeatedly struck Hinton on the head with a wooden board, and that he had stabbed Hinton in the neck with a filet knife while Hinton was on the ground. These facts alone establish that there was a killing of a human being in the heat of passion in a cruel and unusual manner or by the use of a dangerous weapon. The only real question was whether Ward's actions were in necessary self-defense. We find that the State introduced sufficient evidence at trial to allow the jury to find, beyond a reasonable doubt, that Ward's actions were not in necessary self-defense. Ward admitted in cross-examination that he landed a blow on Hinton, after which point Hinton "was losing advantage." He further admitted that Hinton struck him only one time at the beginning of the fight, that the only injury Ward sustained was a cut on his foot, and that Hinton was moving away from him when he began to beat Hinton with the wooden board. Ward testified that he beat Hinton with the board on the back of the head until Hinton fell down. Then, Ward continued to beat Hinton on the face while he lay on the ground, saying at trial, "I wasn't stopping. I didn't know when to stop . . . I was continually, you know, trying to beat him down. When he finally went down I couldn't, you know, I started *1056 just pushing the board into his face, hitting him in the face." Finally, Ward took a filet knife which he claims Hinton was trying to reach and stabbed Hinton twice in the neck.
¶ 22. The autopsy report and Dr. McGarry's testimony provide further evidence on which a jury could make a determination. Dr. McGarry testified that Hinton had been hit in the back of the head and in the face multiple times, and with such ferocity that his cheeks, nose, and jaw had been shattered. Pieces of bone had been driven into Hinton's brain, and the stab wounds to his neck had severed the jugular vein and the trachea. Importantly, Dr. McGarry noted that there were cuts and bruises on Hinton's arms which indicated that Hinton had been attempting to cover his face during the attack. Also, the pattern of the board strikes on Hinton's face were perpendicular, indicating that Hinton's head had not been moving when many of the blows on his face were struck. These facts tend to show that Hinton was not truly a threat to Ward, and that, in fact, Hinton had been helpless and later immobilized as Ward continued his assault.
¶ 23. Photographs of the crime scene showed tremendous amounts of blood, including blood on the walls and the ceiling of the house, suggesting that the beating of Hinton had been particularly severe and ferocious. Finally, Ward's admissions to neighbors who were present at the crime scene that he had "got" Hinton, indicated that Ward's actions had not been in necessary self-defense.
¶ 24. We find that Ward's reliance on the Weathersby Rule is misplaced, since a jury verdict for manslaughter could be reached on Ward's testimony alone. Furthermore, the evidence introduced at trial includes an autopsy report, the expert testimony of Dr. McGarry, and the admissions made by Ward and testified to by witnesses at trial, all of which support a verdict of manslaughter. The Weathersby Rule has no application here.
¶ 25. Viewing this combined evidence in the light most favorable to the prosecution, we find that the trial court did not err in denying the motion for a directed verdict. There was sufficient evidence on which a jury could find, beyond a reasonable doubt, that Ward did not act in necessary self-defense.

IV. WHETHER THE TRIAL COURT ERRED BY GRANTING A MANSLAUGHTER INSTRUCTION
¶ 26. Ward contends that the trial court improperly granted a manslaughter instruction based solely on the fact that Ward and Hinton were involved in an argument earlier in the afternoon of June 23, 2001. Ward argues that this instruction was not justified by the facts and that it allowed the jury to reach a "compromise verdict." The State replies that if the facts presented to the jury support a murder instruction, then the facts support a manslaughter instruction as well.
¶ 27. "When there is a jury issue on the question of murder, the defendant cannot object to a grant by the court of a manslaughter instruction." Barnes v. State, 854 So.2d 1, 6 (¶ 19) (Miss.Ct.App. 2003) (citing Crawford v. State, 515 So.2d 936, 938 (Miss.1987)). "When presented with facts from which the jury could infer the predicate state of mind of the defendant, it is permissible for the jury to use such inferences to find the defendant guilty of manslaughter rather than murder." Id. (citing Jackson v. State, 740 So.2d 832, 834 (¶ 8) (Miss.1999)).
¶ 28. In the instant case, it is abundantly clear that the facts supported a *1057 jury instruction of manslaughter. Ward testified that "things were starting to escalate" with Hinton, and witnesses testified that Ward and Hinton had been involved in a dispute at the beach earlier in the afternoon. Further, Ward's testimony established that he had been "sucker-punched" by Hinton when he returned home that evening, and that a struggle between the two immediately ensued. These facts would allow a jury to determine that Ward had killed Hinton in the heat of passion, and not with malice aforethought. The instruction was properly given.

V. WHETHER WARD WAS DENIED CONSTITUTIONALLY EFFECTIVE ASSISTANCE OF COUNSEL
¶ 29. Ward's submits his final issue pro se, claiming that his trial counsel was constitutionally ineffective. Our standard of review on questions of constitutionally ineffective counsel is very deferential. The defendant bears the burden of showing that:
the trial judge, as a matter of law, had a duty to declare a mistrial or to order a new trial, sua sponte on the basis of trial counsel's performance. Inadequacy of counsel refers to representation that is so lacking in competence that the trial judge has the duty to correct it so as to prevent a mockery of justice.
Colenburg v. State, 735 So.2d 1099, 1102 (¶ 8) (Miss.Ct.App.1999) (citing Parham v. State, 229 So.2d 582, 583 (Miss.1969)). On direct appeal, our inquiry on this issue is limited to the facts which are contained strictly in the record, and not upon mere assertions in briefs. Id.
¶ 30. The test for ineffective assistance of counsel was established in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Our supreme court has stated the test as (1) whether counsel's overall performance was deficient and (2) whether or not the deficient performance, if any, prejudiced the defense. Taylor v. State, 682 So.2d 359, 363 (Miss.1996). The burden is on the defendant to prove both prongs, and the adequacy of counsel is measured by a totality of the circumstances. Id.
¶ 31. Ward argues only one ineffective act on behalf of his trial counsel: that counsel failed to interview or subpoena witnesses who could explain defense exhibit 2 to the jury. Defense exhibit 2 is a picture of Ward's face taken when Ward was brought to the hospital following the incident in question, which Ward claims shows a bruise from being "sucker-punched" by Hinton. Ward claims that the bruise was not clear in the picture, and that his counsel should have interviewed the "nurses, doctors, police, and photographer" present at the hospital who had seen the bruise on Ward's face. This argument is disingenuous. Proof of a bruise on the side of the face was unnecessary in light of the fact that Ward claimed that Hinton had "sucker-punched" him, and this testimony was uncontradicted. The jury was able to reach a verdict of manslaughter even accepting that Hinton had thrown the first punch. Whether or not the picture showed a bruise is not relevant, and this issue is therefore clearly without merit.
¶ 32. Furthermore, Ward's argument is not supported by the record. As such, it amounts to a mere assertion in a brief. Thus, this issue is barred on direct appeal. Colenburg, 735 So.2d at 1102 (¶ 8).
¶ 33. We find that the trial court did not err on any of the five issues presented by Ward on appeal. We therefore affirm the judgment of the trial court.
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON *1058 COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF SEVENTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., BRIDGES, IRVING, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR.
NOTES
[1] In a pro se brief he filed on his behalf in this appeal, Ward describes the event as follows:

Mr. Ward repeatedly swung and beat-on Mr. Hinton with this board while Mr. Hinton continued to get to the knife. Finally Mr. Hinton fell to the ground in the kitchen where the counter to the knife was located. Mr. Ward continued to strike Mr. Hinton with the board not knowing to what extent he had hurt Mr. Hinton, so not knowing whether Mr. Hinton would get up and continue his threat, Mr. Ward discarded the board and grabbed the knife Mr. Hinton was trying to get and stabbed Mr. Hinton in the neck.
[2] The Weathersby Rule provides that:

where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts, or by the facts of common knowledge.
Weathersby v. State, 165 Miss. 207, 209, 147 So. 481, 482 (1933).